

Opinions of the United
States Court of Appeals
for the Third Circuit

5-30-2008

# Gomez-Zuluaga v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 07-2674

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Gomez-Zuluaga v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1082.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1082

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-2674

———

CLAUDIA ROCIO GOMEZ-ZULUAGA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

———

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A98 497 068)
Immigration Judge:  Dorothy Harbeck

———

Argued January 10, 2008
Before:  FISHER, HARDIMAN
and STAPLETON, *Circuit Judges*.

(Filed: May 30, 2008)

Rachelle Abrahami
Alessandra DeBlasio (Argued)
Shearman & Sterling
599 Lexington Avenue
New York, NY  10022
    *Attorneys for Petitioner*

Jeffrey L. Menkin
Michael P. Lindemann
Ethan B. Kanter (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC  20044
    *Attorneys for Respondent*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Claudia Rocio Gomez Zuluaga ("Petitioner")[1] seeks review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of her request for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). For the reasons that follow, we will grant the petition in part and deny it in part.

## I. BACKGROUND

Petitioner, a native and citizen of Colombia, was born on July 3, 1987, in a rural region near San Francisco, Colombia. During most of her life, the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), a leftist guerrilla revolutionary group, was active throughout much of Colombia. The FARC was officially formed in 1966 and has continuously and often violently opposed the Colombian government since that time. The FARC is designated as a terrorist organization by the United States Government. While the FARC is active throughout Colombia, it holds particular sway in many rural areas where it effectively controls local politics and the civilian population. In 2002, after peace negotiations between the FARC and the Colombian government broke down, violence escalated and the FARC began to specifically target civilians. Although the

_____

[1]Although Petitioner's surnames are hyphenated ("Gomez-Zuluaga") in the case caption, according to her counsel, Ms. Gomez Zuluaga does not hyphenate her surnames and we will likewise follow this practice.

3

FARC has used a variety of methods to finance and prosecute its guerilla war, one intimidation technique it has regularly used is to ban women and girls from fraternizing with members of the security forces, police officers, or officials of the Colombian government. Such women have occasionally been deemed "military targets." Women who have transgressed the ban have often been targeted for intimidation, kidnapping, rape, and murder.

Petitioner's first experience with the FARC occurred when she was six years old. At that time, a number of armed guerillas commandeered her family's farm in rural La Bretana. The guerrillas pressed the family members into service during their occupation, requiring them to run a variety of errands for them. At one point during this occupation, Petitioner heard a gunshot, and minutes later witnessed the guerillas pass by the farmhouse carrying a dead body in a cot. Although she did not recognize the deceased person, the incident made Petitioner very afraid. Shortly after this, Petitioner's father, fearful that the FARC would return, moved the family to another rural area, La Granja.

During her time in La Granja, Petitioner witnessed and experienced many more encounters and confrontations with the FARC and the collateral effects of civil war. When she was eleven, her family finally left La Granja due to the FARC's displacement of civilian populations. Petitioner's parents moved back to her birthplace, San Francisco, about an hour-and-a-half drive from La Granja, while Petitioner went to live with her sister two to three hours away in the relative safety of

Medellin. As she was still a very young person at the time, she often went to visit her parents in San Francisco.

In August 2003, when Petitioner was sixteen, she began dating a military officer who lived in La Granja. In February 2004, she went to San Francisco to visit her parents. While she was at the family home, a man knocked on the door and told her that she had to come with him. He then took her to an outdoor playing field where she observed additional armed men and many other women who had been brought there under similar duress. The men identified themselves as being affiliated with the FARC and told the women that the FARC knew that they were "with military officials" and that such behavior was an "insult" to the FARC. The men told them that being with the soldiers was the equivalent of being against the FARC, and if the women "did not end it with them," then "something [would] happen to [them] or their families."

The FARC detained the women for nearly two hours, during which time Petitioner recalls being very afraid and worried. Adding to her fear, a number of the women informed her that they had previously been kidnapped for dating military officers. Moreover, Petitioner did not know how the FARC was even aware of the fact that she had been dating a military officer. Before releasing the women, the guerillas obliquely warned them that they should remember what they had been told, and that they should pay attention to it. Although Petitioner had not been physically harmed, she feared for both her own and her family's safety. Believing the threat to be genuine, she reluctantly broke off her relationship with the military officer from La Granja.

5

Petitioner continued her studies in Medellin. By 2005, her mother had moved in with her in Medellin because the FARC set off a number of car bombs in San Francisco and caused problems with the transportation system. Petitioner began dating a police officer from Medellin, thinking that the FARC would have no way of knowing of her activities in that city. Throughout this time, Petitioner continued to visit her father in San Francisco regularly. During one visit in the summer of 2005, an armed man came to her father's house and threateningly intimated that she "would find it preferable" to do as he instructed and accompany him. Although she was "scared because of what happened to [her] the first time," she agreed, and they proceeded on foot to a hilly area on the outskirts of town. There they met up with two other men, armed with ammunition and grenades, who wore FARC colors and identified themselves as members of the guerilla organization.

The men told her that "it appeared that [she] hadn't paid any attention to what they had told her the last time, and it looked like she was still going out with . . . the police." Petitioner could not understand how these men knew about her relationship in Medellin, but the men told her that they were "aware of everything [she] did, [and] that they were watching [her]." She became "very scared" that they were going to kill her or do something to her. The men continued to detain her for about an hour, and then released her, admonishing her that if she "was in favor of the army or of the police, then [she] must be against them."

Upon returning to Medellin, Petitioner "backed off," and then, in August 2005, ended her relationship with the police

officer. She told him that the FARC had somehow learned of their relationship, that they continued to watch her, and that they told her that she could not date a police officer. He told her that despite his position as a police officer, there was not much that he could do to protect her, given that the FARC pervaded the entire country and she would always be vulnerable.

In January 2006, Petitioner again visited her father in San Francisco. During her stay, an armed man approached her in broad daylight at the local church and ordered her to go with him. Despite the fact that there were other people nearby, Petitioner was "very scared" by the more brazen nature of this encounter and agreed to go with him. The armed man covered her eyes, and gripping her by her hands, began to lead her out of town. Because she was blindfolded, Petitioner could not tell where the man was taking her. After nearly two hours of walking, they arrived at a small empty house where they were met by a number of other armed men. Petitioner was chained to a bed, and when she asked why she had been abducted, the men remained silent. This continued until the next day, when Petitioner again asked them why they had abducted her, since she hadn't been going out with anyone. The men told her "that wasn't it, that they had intentions for me with them." The men kept Petitioner chained to the bed for the duration of her time there, only allowing her to be unchained to go to the bathroom, and always with one of the guerillas present.

Petitioner continued to beg for her life throughout this ordeal. Eventually, she told the men that she was a student and that she was studying to be a dental hygienist. She further told them that she was the only person in her family to make it so far

7

in school. She implored them to let her go so that she could complete her studies, trying to think of "anything I could so they would let me go." Upon learning that Petitioner was studying to be a health professional, the men began to talk amongst themselves, and one of the men remarked that it was "very good." The men then left Petitioner alone again for a while. After returning, they informed her that they were going to release her, and that once she completed her studies (within five months of the abduction), she was to return and work for them. Keeping her eyes covered, the men unchained her, and then left her near the town. In all, the FARC had confined Petitioner for eight days.

During the time that she was away, armed guerillas visited Petitioner's father at his home and told him that they had kidnapped her. They warned him that if he told anybody, they would kill her. As a result, her father became very worried when she did not immediately return. After being released, Petitioner made her way to her father's house, where her father was "very happy" to see her and to learn that she had not been physically injured. Neither she nor her family reported the incident to the police for fear of reprisal. She recalled that she only told her family a "little bit" because of the traumatic nature of the experience and she did not give details. In her words, "[n]obody knew."

The very next day, Petitioner departed for Medellin. Since that time, she has not returned to San Francisco and has not seen her father again. Although she remained in contact with him for another two months, his calls suddenly ceased

around March 2006, and no one in her family has received any communication from him.

The day she left for Medellin, Petitioner received a phone call on her cell phone from a person identifying himself as a member of the FARC. He told her that she was being watched and that the FARC knew everything about her life. They called her one to three times per month, telling her that they were watching her and waiting for her to finish her studies, and constantly reminding her of her promise to work for them. When she finally finished her studies, she "realized that [she] had to leave the country" because the fact that the FARC had tracked her to Medellin meant that she was not safe in any part of the country. The FARC had effectively threatened her everywhere that she had ever lived, including La Bretana, Medellin, La Granja, and San Francisco. She believed that the FARC would pursue her relentlessly, having previously threatened or attacked other members of her family, including her sister, uncle, and cousin. Her sister's husband had been kidnapped and their house had been bombed. Her uncle had been shot for refusing to cooperate with the FARC. Her cousin had been forced to work for the FARC. When her cousin escaped from this involuntary servitude, the FARC murdered him. She believed that now that she had graduated, if she refused to work for the FARC, "what happened to her cousin would happen to [her], also."

In June 2006, Petitioner decided to go to the United States. A year before, after the first two abductions, she had tried and failed to obtain a visa. This time, fearing for her life, she paid a man nearly $1,000 for a counterfeit Spanish passport.

She entered the United States on July 22, 2006, through Newark International Airport where she was detained upon discovery of her actual identity. During an interview with authorities, Petitioner explained her reasons for entering the United States illegally, and that she feared what might happen to her if she were returned to Colombia. A few days later, the FARC again attempted to contact her on her cell phone, which she had given to her sister. They told her sister that Petitioner "should appear, that it would be better if [she] appeared."

Petitioner was placed in removal proceedings and granted a hearing date of December 19, 2006 before an immigration judge ("IJ") (an additional hearing regarding the Petitioner's refugee status category was held on December 27, 2006).[2] Petitioner requested asylum, withholding of removal, and relief under the CAT. She submitted a psychiatric evaluation, an affidavit from an expert on Latin America, and a brief in support of her claim, with Amnesty International and the United States State Department documentation attached.

On January 4, 2007, the IJ issued a decision and order denying Petitioner's application for asylum, withholding of removal, and relief under the CAT. The IJ found Petitioner's testimony to be "credible" and determined that the events that she described were consistent with the reports, and plausible

_____

[2]Petitioner remained in detention during this period, and her sister (living in Boston), to whom Petitioner had entrusted her mobile phone, received a number of calls from FARC members who continued to threaten Petitioner.

10

given country conditions inside of Colombia. She found, however, that as a matter of law Petitioner could not establish that she was a refugee under the Immigration and Nationality Act ("INA") because she was not able to show that the FARC's actions against her were motivated by a political opinion that had been imputed to her, or by her membership in a particular social group.

In support of her decision, the IJ purportedly relied on INA § 208(b)(1)(B)(i), stating that in order to qualify for refugee status, the applicant "must demonstrate that a protected ground was or would be the *central* reason for the persecution." As refugee status is a prerequisite for any successful asylum application or request for withholding of removal under INA § 241(b)(3), the IJ concluded that Petitioner's claims on these two bases must necessarily fail. The IJ also denied Petitioner's CAT claim, finding that the Petitioner failed to show that she was "more likely than not to be tortured" upon her return to Colombia by "someone from the government," relying on *Matter of S-V-*, 22 I. & N. Dec. 1306 (BIA 2000).

On May 15, 2007, the BIA upheld the IJ's decision. The BIA acknowledged that the IJ had incorrectly cited INA § 208(b)(1)(B)(i), which actually states that a protected ground must constitute "at least one central reason" for the persecution alleged, rather than, as the IJ stated, "the central reason."[3] The BIA essentially found this error to be harmless in light of its

---

[3]This change was made by the REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231, 303.

agreement with the IJ's finding that the events "d[id] not arise to persecution on account of a protected ground." The BIA also found that Petitioner did not have a well-founded fear of persecution on account of a protected ground. Finally, the BIA summarily affirmed the IJ's determination that Petitioner had not shown that it was more likely than not that she would be tortured upon her return to Colombia and thus affirmed the IJ's denial of her CAT claim. The BIA then ordered Petitioner's removal to Colombia. Petitioner timely filed a petition for review on June 4, 2007.[4]

---

[4]Petitioner was detained upon entry into the United States and remained in detention during this process, despite attempts by her counsel to have her released. On July 17, 2007, Petitioner was granted a Stay of Removal during the pendency of her appeal with this Court pursuant to INA § 242(b)(3)(B) and thus continued to remain in detention in the United States. On November 13, 2007, she filed a *pro se* motion to lift the Stay of Removal so that she might be released from detention. In this motion, Petitioner acknowledged that she understood that lifting the stay of removal would subject her to removal to Colombia immediately and she had fully considered the consequences of her request. She averred that despite the fact that her "fear of persecution is as strong as ever[,]" the detention was, in her words, "affecting me physically and destroying me mentally" and suggested that her detention in the United States served as a daily and unwelcome reminder of the indignity of detention at the hands of the FARC. In December 2007, prior to oral argument, we granted the motion to lift the Stay of Removal and on January 3, 2008, Petitioner was removed to Colombia.

12

## II. JURISDICTION AND STANDARD OF REVIEW

The BIA properly exercised jurisdiction over Petitioner's appeal from the IJ's decision pursuant to 8 C.F.R. § 1003.1(b). *Filja v. Gonzales*, 447 F.3d 241, 253 (3d Cir. 2006). We have jurisdiction to review the BIA's decision under INA § 242(a). Because the BIA adopted some of the findings of the IJ and made additional findings, we will review the decisions of both the BIA and the IJ. *Santana Gonzalez v. Att'y Gen.*, 506 F.3d 274, 276 (3d Cir. 2007).

We review legal determinations by the BIA de novo. *Escobar v. Gonzales*, 417 F.3d 363, 365 (3d Cir. 2005). Whether an applicant's proffered "particular social group" is cognizable under INA § 101(a)(42)(A) is a question of law, and is therefore subject to de novo review. *Id.* at 365 (citing *Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004)). Such de novo review of the BIA's legal determinations is of course "subject to established principles of deference" set out in *Chevron v.*

---

Because a final order of removal creates "sufficient collateral consequences," Petitioner's removal does not moot her petition for review. *See Amanfi v. Ashcroft*, 328 F.3d 719, 724-25 n.1 (3d Cir. 2003).

13

*National Resources Defense Council*, 467 U.S. 837 (1984).[5] *See Wang*, 368 F.3d at 349.

The petitioner has the burden of establishing "persecution" and a "well-founded fear of persecution," which includes, but is not limited to, "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Yu v. Att'y Gen.*, 513 F.3d 346, 348 (3d Cir. 2008); *see also Lukwago v. Ashcroft*, 329 F.3d 157, 167 (3d Cir. 2003). Whether a petitioner has established these elements is a question of fact, and the agency determination must be upheld if it is supported by "substantial evidence" in the record. *Lukwago*, 329 F.3d at 167. Our review is confined solely to the administrative record, INA § 242(b)(4)(A), and we must treat the BIA's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B); *Lukwago*, 329 F.3d at 167.

### III. DISCUSSION

On appeal, Petitioner challenges the BIA's decision denying her application for asylum, withholding of removal, and

---

[5]These principles, as reiterated in *Lukwago v. Ashcroft*, boil down to the following axiom: "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 329 F.3d 157, 167 (3d Cir. 2003) (quoting *Chevron*, 467 U.S. at 843).

relief under the CAT. Because the IJ found Petitioner credible, a determination left undisturbed by the BIA, we treat Petitioner's testimony as true and accurate for purposes of our analysis.

## A. ASYLUM

INA § 208(b) gives the Attorney General or the Secretary of Homeland Security discretion to grant asylum to an alien who qualifies as a "refugee" under INA § 101(a)(42)(A). Under this section, an applicant must show that at the time of her application, she is a

> "person who is outside [the] country of [her] nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]"

INA § 101(a)(42)(A). These categories – race, religion, nationality, membership in a particular social group, and political opinion – are often described as "enumerated grounds" or "protected grounds." *See*, *e.g.*, *Lukwago*, 329 F.3d at 167. Petitioner must show any persecution occurred or will occur not only "on account of" a protected ground, but that the protected ground constitutes "at least one central reason for persecuting the applicant." INA § 208(b)(1)(B)(i).

15

Petitioner first claims that she qualifies for asylum because she has been persecuted by the FARC in the past on account of (1) a political opinion imputed to her by the FARC based on her romantic association with government-affiliated officers, and (2) her membership in a particular social group that she defines as "[Colombian] women who have the shared past experience of relationships with military and police men." She also claims that she qualifies for asylum because she has a well-founded fear of future persecution on account of imputed political opinion and membership in a particular social group. For purposes of her future persecution claim, Petitioner posits that "upon her 'escape' from the FARC . . . [Petitioner] became a member of a narrower social group than the one proposed with respect to the past persecution she suffered." The group she proffers for her future persecution claim is "women who have escaped involuntary servitude after being abducted and confined by the FARC." She explains that this narrower social group is "defined by a shared past experience [of being abducted and threatened, and that] her membership can be attributed to her escapee 'status.'"[6]

---

[6]Although the IJ seems to conflate the past and future "particular social group" claims, both the bifurcated structure of the asylum statute and our case law support an applicant's right to allege membership in different social groups depending on whether they are making a "past persecution" claim or a "well-founded fear of future persecution" claim. *See Lukwago*, 329 F.3d at 167.

16

We will first examine Petitioner's past persecution claim and assess whether any of the incidents Petitioner alleges rise to the level of persecution. For those incidents that do rise to the level of persecution, we will consider whether they were motivated by Petitioner's social group or imputed political opinion. If Petitioner fails to establish past persecution on account of a protected ground, we will then consider the separate question of whether Petitioner has established a well-founded fear of future persecution on account of a protected ground.

## 1. PAST PERSECUTION

One way a petitioner may qualify for asylum is by showing past persecution, which "gives rise to a rebuttable presumption of a well-founded fear of future persecution." *Li v. Att'y Gen.*, 400 F.3d 157, 163 (3d Cir. 2005). The INA does not define "persecution." *Id.* at 170 ("Congress chose not to define 'persecution' in the Refugee Act, nor has any legislative definition been enacted in the interim."). We have held that persecution, while not inclusive of every act that our society might regard as unfair, unjust, unlawful, or unconstitutional, generally includes treatment like death threats, involuntary confinement, torture, and other severe affronts to the life or freedom of the applicant. *See Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001).

Petitioner claims that all three of her involuntary detentions by the FARC constitute persecution. The government argues that none of the FARC's treatment of Petitioner was so harmful as to rise to the level of persecution.

17

We disagree with both of these claims. As we will explain, while Petitioner's first two encounters do not rise to the level of persecution, her eight-day abduction at the hands of the FARC does rise to the level of persecution.

While we have stated that threats may constitute persecution, "we have limited the types of threats constituting persecution to only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm." *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006) (citing *Li*, 400 F.3d at 164) (internal quotation marks omitted). Both *Chavarria* and *Li* are instructive as to where the line should be drawn.

In *Li*, the petitioner, a Chinese national, was repeatedly threatened by authorities with physical mistreatment, sterilization, and detention after the birth of his fourth child. 400 F.3d at 165-70. In addition, he was subjected to actual economic hardship in the form of deprivation of certain benefits. *Id.* While we held that the actual economic hardship constituted persecution, the unfulfilled "threats of physical mistreatment, detention, or sterilization described by Li do not appear to have been sufficiently imminent or concrete for the threats themselves to be considered past persecution." *Id.*[7]

_____

[7]In *Li* we noted that "[r]ather than consider such threats past persecution . . . unfulfilled threats are generally within that category of conduct indicative of a danger of future persecution." 400 F.3d at 165 (internal quotation marks omitted). This characterization applies similarly here. *See infra*

18

In *Chavarria*, the petitioner, a Guatemalan national, witnessed two women being attacked by government paramilitaries and came to their aid. 446 F.3d at 513. A few days later, Chavarria saw familiar-looking men conducting surveillance of his house and subsequently learned that the women he had helped had been human rights workers opposed to the government. *Id.* Later, after briefly moving to the United States out of fear for his safety, he returned to Guatemala and a second incident occurred. *Id.* This time, armed men forced him into the back seat of his car, put a gun to his head, robbed him, and threatened to kill him if they ever saw him again. *Id.* Chavarria believed that these men were affiliated with the paramilitaries, and fearing for his life, again fled to the United States. *Id.*

In assessing the question of whether the actions against Chavarria rose to the level of persecution, we found that the act of surveillance alone did not constitute persecution because "even if considered a threat, [it] was not highly imminent nor menacing enough to rise to the level of persecution." *Id.* at 519. However, we found that the explicit death threat during the second incident did rise to the level of persecution because "it was both highly imminent, concrete and menacing and Chavarria suffered harm from it." *Id.* at 520. We explained that "[t]his threat is unlike the threats we encountered in *Li*, which were merely verbal and not concrete because here, the attackers actually robbed Chavarria, pointed a gun to his face, and threatened him with death if he told his story." *Id.*

---

our discussion of future persecution.

Applying these standards to the present case, Petitioner's first two encounters with the FARC do not rise to the level of persecution. First of all, the FARC's apparent surveillance of Petitioner to determine whether she was dating government officers, while certainly threatening and violative of Petitioner's privacy, is similar to the surveillance in *Chavarria* which we found did not rise to the level of persecution. 446 F.3d at 519. More importantly, while FARC guerillas twice rounded up Petitioner at gunpoint along with other women and warned her not to fraternize with government officers, these detentions were brief and Petitioner was not physically injured or robbed as Chavarria was. *Id.* at 513. In addition, the record indicates that the guerillas were armed, but it does not suggest the guns were brandished or used in the same threatening manner as in *Chavarria*. *Id.* The first two detentions are close to the line, but on balance are more similar to the situation in *Li*, where the threats were oblique and not imminent, and the petitioner was not appreciably harmed. Such brief detentions, where little or no physical harm occurs, generally do not rise to the level of persecution. *See Jarbough v. Att'y Gen.*, 483 F.3d 184, 191 (3d Cir. 2007) (holding that two brief detentions of petitioner by the Syrian government, while "harassing and intimidating," did not rise to the level of persecution).

These earlier incidents do not rise to the level of persecution, but Petitioner's eight-day abduction and confinement does. Petitioner testified that an armed man forced her to walk for two hours, eyes covered and hands bound, before chaining her to a bed in an unfamiliar house in the hills. There, she remained blindfolded, while a number of armed men repeatedly threatened her, menacingly informed her that "they

20

had intentions" with her, and told her that they wanted her to "stay with them." The men even remained with her when she periodically went outside to the bathroom. The FARC guerillas confined her under these conditions for eight days.

While we have explained that detentions alone do not necessarily constitute persecution, this unlawful abduction rises to the level of persecution because of the duration of confinement, the deprivation of Petitioner's freedom of movement and sight, the invasion of Petitioner's privacy, the implicit and overt threats made against her person, the ominous warnings upon her release that the FARC would be "very attentive" to her, and that she was obliged to return to serve their cause upon completion of her studies. *See*, *e.g.*, *Lukwago*, 329 F.3d at 169 ("Even if forced conscription by a guerrilla organization alone would not qualify a victim for asylum that does not mean that, in appropriate circumstances, it cannot constitute persecution."); *Yu*, 513 F.3d at 348 (holding that confinement can constitute persecution).

Moreover, "we do not consider the [final incident] *in vacuo*; we weigh it in conjunction with the prior incidents." *Toure v. Att'y Gen.*, 443 F.3d 310, 318 (3d Cir. 2006) (finding that petitioner's flight after "harassment continued and escalated" reinforced the claim). Weighing this final incident in the context of the prior incidents shows that Petitioner's allegations regarding the imminence and menacing nature of the threats are justified. The overall trajectory of the harassment against her "continued and escalated" with each new incident, from which we can infer both the imminence and the concreteness of the threat at the time of the eight-day

21

confinement. Therefore, it is clear that this final incident rises to the level of persecution.

However, as we pointed out in *Lukwago*, a demonstration of past persecution alone is not sufficient to qualify an applicant for asylum. 329 F.3d at 170. We must also "look beyond the applicant's conduct to the persecutor's motives." *Id.* As the Supreme Court has stated, the INA "makes motive critical" and an asylum applicant must provide "some evidence of [motive], direct or circumstantial." *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992).

Both the BIA and IJ held that Petitioner's application failed as a matter of law because she did not show her political opinion or her particular social group constituted "at least one central reason" for her persecution by the FARC. The IJ stated that

> "as a matter of law, her claim for asylum, and her claim for withholding of removal pursuant to Section 241(b)(3) fail because she cannot prove that she was persecuted because of her political opinion or because of her alleged membership in a particular social group."

First, the IJ found that women who date military or police officers do not constitute a particular social group. The IJ noted that this was not a recognized category under *Escobar*, 417 F.3d

22

at 367,[8] and stated that because the group is not based on an

[8]According to our survey in *Escobar*,

"Courts have excluded from the classification: young, urban El Salvadoran males of military age who had not served in the military, *Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986); youths with gang identification tattoos, *Castellano-Chacon v. INS*, 341 F.3d 533 (6th Cir. 2003); voluntary members in a taxi cab cooperative that refused to yield to guerrillas, *Matter of Acosta*, 19 I. & N. Dec. 211 (1985); and adult women raped and brutalized as children in El Salvador, *Gomez v. INS*, 947 F.2d 660 (2nd Cir. 1991).

Courts have recognized the following social groups: a family targeted for harassment and violence because they were related to an allegedly racist boss in South Africa, *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005); children with "disabilities that are serious and long-lasting or permanent in nature and parents who care for them," *Tchoukhrova v. Gonzales*, 404 F.3d 1181, 2005 WL 913449 (9th Cir. 2005); Somali women under threat of genital mutilation, *Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005); a familial sub-clan in Somalia, *In re H-, Applicant*, 21 I. & N. Dec. 337 (BIA 1996); and former members of

23

immutable characteristic, it cannot qualify as a particular social group. The IJ opined that "women," like "youth," was too large and diverse a group to constitute the basis of a particular social group. *See Lukwago*, 329 F.3d at 172. The IJ also relied on the logic that because the BIA had previously held that police officers are not a particular social group, women who date them cannot be. *See Matter of Fuentes*, 19 I. & N. Dec. 658 (BIA 1988). The IJ concluded that "one who dates" cannot be an immutable characteristic.

The IJ also found that Petitioner was not persecuted because of her political opinion or an imputed political opinion. She reasoned that the FARC had simply stated that they wished Petitioner to work for them, giving no insight into the FARC's motivations. The IJ took issue with Petitioner's reliance on *Chavarria*, distinguishing it first on the basis that the persecutors in *Chavarria* were government affiliates, while the persecutors here are opposed to the government.[9] The IJ also posited that here, unlike *Chavarria*, "the most severe act of persecution had nothing to do with respondent's dating of police and military officers." The IJ stated that Petitioner's eight-day confinement, during which her captors eventually explained that

El Salvador's national police, *Matter of Fuentes*, 19 I. & N. Dec. 658 (BIA 1988)."

*Escobar*, 417 F.3d at 367.

[9] It is difficult to see how this first distinction is relevant, and the IJ does not explain it further.

24

they wanted her to "stay with them" was guerilla recruitment, as distinct from harassment for dating government officers; and guerilla recruitment, without more, is generally not a basis for finding imputed political opinion. *See*, *e.g.*, *Elias-Zacarias*, 502 U.S. at 481 (holding that a guerrilla organization's attempt to conscript a person into its military forces does not necessarily constitute persecution on account of political opinion). The BIA agreed with the IJ's findings and added that

> "the applicant has not sufficiently shown that guerilla forces imputed a hostile political opinion to her or targeted her for harm on account of her membership in a particular social group. Rather, as the applicant indicated, she was threatened by guerillas for making what they perceived as being disrespectful relationship choices and in an attempt to recruit the applicant for her health related background."

Petitioner has presented sufficient record evidence that the earlier incidents in which she was detained by the FARC were motivated by the FARC's desire to dissuade her and other young women from dating, and thus affiliating themselves with government officers. However, as we held that these earlier incidents do not rise to the level of persecution, they do not provide a basis for establishing refugee status, regardless of the motivation behind them.

Because Petitioner's eight-day abduction and confinement does rise to the level of persecution, we may consider whether Petitioner has shown that the FARC was

25

motivated by a protected ground when it perpetrated this incident. We agree with the IJ and the BIA that there is substantial evidence on the record that this final incident was not centrally motivated by any imputed political opinion or social group status based on Petitioner's dating of government officers, but rather by a desire to recruit Petitioner. During the first two incidents, the FARC clearly expressed to the women that it was rounding them up to warn them not to date government officers. But during the eight-day abduction, Petitioner asked the guerillas if she was being punished for dating a military officer, and they told her "that wasn't it." Moreover, Petitioner "hadn't been going out with anyone," unlike prior to the previous incidents.

While the Petitioner's treatment at the hands of the guerrillas is no doubt abhorrent and repugnant to our sensibilities, Petitioner has not established that this past treatment occurred because the guerillas believed that she held a particular political opinion or because she was a woman who dated government officers.[10] Here, the evidence suggests that the FARC was simply motivated by a desire to "fill their ranks," which is not a protected ground under the statute. *Elias-Zacarias*, 502 U.S. at 482.

---

[10]It is not necessary to determine whether this is a cognizable "particular social group" under the statute, because there is substantial evidence in the record to conclude that the FARC was not motivated by Petitioner's membership in a particular social group when they abducted her for eight days, but was instead motivated by a desire to recruit her.

26

## 2. WELL-FOUNDED FEAR
## OF FUTURE PERSECUTION

While Petitioner has failed to show past persecution motivated by a protected ground, that is not the end of the analysis. A showing of past persecution merely triggers a rebuttable presumption that Petitioner has a well-founded fear of future persecution. *Lukwago*, 329 F.3d at 174 (citing 8 C.F.R. § 208.13(b)(1)). While this presumption is often determinative of a petitioner's asylum claim, it is not necessary for a petitioner to show past persecution if she can nonetheless show a well-founded fear of future persecution without the benefit of such a presumption. *Id.* Such are the circumstances of the case before us.

Petitioner is not relieved of her burden of showing, as a threshold matter, that her race, religion, nationality, membership in a particular social group, or political opinion will be one of the central reasons motivating her persecutors to target her. *Id.* For purposes of her future persecution claim, Petitioner has proffered a different "particular social group" from the one offered in support of her past persecution claim. That group is "women who have escaped involuntary servitude after being abducted and confined by the FARC."[11] Because this group is

---

[11]Because Petitioner convinced the FARC to release her based on a promise to return and join them that she never intended to keep, we believe her actions here are tantamount to an escape from forced conscription. Thus, the circumstances here are functionally equivalent to the circumstances in

based in part on events that happened in the past, it is effectively a "status or condition" that is sufficiently immutable to be considered a particular social group. *See Escobar*, 417 F.3d at 367 (holding that generally, "those who possess immutable characteristics such as race, gender or a prior position, status or condition" can be considered members of a particular social group); *see also Matter of Acosta*, 19 I. & N. Dec. 211, 333 (BIA 1985) ("The shared characteristic . . . might be a shared past experience such as former military leadership or land ownership.").

Moreover, this group is narrow and distinctive, and while clearly related to the FARC's past mistreatment of numerous individuals, it exists independently of the persecution that Petitioner fears that she will suffer in the future as a member of this particular social group. As we explained in *Lukwago*,

> "We agree that under the statute a 'particular social group' must exist independently of the persecution suffered by the applicant for asylum. Although the shared experience of enduring past persecution may, under some circumstances, support defining a 'particular social group' for purposes of fear of future persecution, it does not support defining a 'particular social group' for past persecution because the persecution must have been 'on account of' a protected ground.

*Lukwago*, 329 F.3d at 164 (Lukwago was able to escape from forced conscription "while collecting firewood").

28

INA § 101(a)(42)(A). Therefore, the 'particular social group' must have existed before the persecution began."

329 F.3d at 172. It is precisely Petitioner's escapee status that is likely to motivate the FARC to seek her and persecute her in the future. Unlike in the past persecution context, her escapee status has already attached, and a fortiori will have existed before any future persecution occurs.

This scenario parallels *Lukwago*. In that case, we accepted, for purposes of showing a well-founded fear of future persecution, Lukwago's proffered "particular social group": "children from Northern Uganda who have escaped from involuntary servitude after being abducted and enslaved by the LRA [Lord's Resistance Army, a group of anti-government guerillas]." *Id.* at 174-75. There is no relevant distinction between this group and the social group that Petitioner has proffered here. Both groups encompass former captives of guerilla groups who escaped from that captivity and are therefore stigmatized by the experience. Based on the degree of similarity between Lukwago's and Petitioner's situations, we see no reason why membership in the group, "women who have escaped involuntary servitude after being abducted and confined by the FARC," cannot form the basis for establishing refugee status in a future persecution claim.

In order to show that a fear is "well-founded" under the asylum statute, Petitioner must show that her fear is both subjective and objectively reasonable, *Abdille v. Ashcroft*, 242 F.3d 477, 495-96 (3d Cir. 2001), which she may do by using

29

testimonial, documentary, or expert evidence, *Lukwago*, 329 F.3d at 177. Where documentary evidence is insufficient, credible and persuasive testimony from the petitioner may be sufficient to establish both objective and subjective fear. *Id.* "To satisfy the objective prong, a petitioner must show he or she would be individually singled out for persecution or demonstrate that there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of" a protected ground. *See Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006). A "pattern or practice" of persecution must be "systematic, pervasive, or organized." *Id.* (quoting *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005).

We first examine the IJ's and the BIA's decisions that Petitioner had not established that she had a well-founded fear of future persecution. In its brief two-sentence analysis, the IJ determined that despite the threats against her, Petitioner did not establish a well-founded fear because the threats are "not based on her immutable characteristics." The BIA affirmed the IJ's analysis in a single sentence, finding that "the record does not support the applicant's claim of having a well-founded fear of persecution on account of a protected ground." While neither the IJ nor the BIA has provided us a detailed analysis on this point, we construe these decisions to reject both Petitioner's proffered social group and her claim that her fear was well-founded. Such truncated review of Petitioner's well-founded fear cannot be the basis for rejecting her claim, which, as we will explain, is supported by both the law and the record.

30

Applying the above framework to Petitioner's case, we first hold that Petitioner has established a subjective fear of future persecution through her testimony before the IJ:

> Q.    And what do you think would happen to you if you – what did you think would happen to you if you didn't join the FARC as you wanted after you graduated?
>
> A.    That they were going to kill me, that is to say what happened to my cousin most likely would happen to me, also.

Petitioner's cousin had previously been forced to join the FARC, and after he was able to escape, the FARC killed him. She later reiterated her own personal fears:

> Q.    And what do you think the FARC would do if you were forced to return to Colombia?
>
> A.    Well, the most likely thing would be that they would kill me. The same thing happened to my cousin. He escaped from them, and they killed him, and here I escaped from them, also.

These statements, which the IJ herself found to be credible, are sufficient to establish that Petitioner subjectively feared persecution. *Lukwago*, 329 F.3d at 177.

Petitioner's specific fear is also objectively reasonable. First, Petitioner testified that the FARC had harmed or threatened members of her family: her brother-in-law was abducted, her sister's house was bombed, her uncle was shot three times, her cousin was killed as punishment for escape, and shortly after Petitioner left, her father disappeared. All of these incidents show that the FARC is both willing and able to exact retribution on those individuals who defy it and makes it a practice to do so. That these incidents involve members of Petitioner's own family only reinforces the imminence and proximity of the threat to Petitioner specifically.

Second, Petitioner has consistently received threatening phone calls and messages since her abduction. The FARC contacted her between one and three times a month and told her that they were watching her and knew everything about her. They reminded her of her "commitment" to them and that they had been able to watch her and find her everywhere she had lived: La Bretana, La Granja, Medellin, and San Francisco. Even after she fled to the United States, the FARC contacted her by cell phone, which her sister, who had been keeping the phone for her, answered. The FARC representative ominously told her that Petitioner "should appear, that it would be better if [she] appeared." This testimony reinforces not only that it is reasonable to believe that the FARC will continue to track and monitor Petitioner, but that the FARC's threats are credible in the sense that they have consistently shown a capability and an inclination to locate and punish Petitioner.

Finally, the articles and reports submitted by Petitioner corroborate the reasonableness of her fears. The 2004 State

32

Department Report on Colombia says that FARC does in fact practice forced conscription and that the FARC commanders often threatened to kill deserters and their families. In addition, the State Department Report states that the FARC guerillas have been known to threaten, beat, rape, and sexually abuse women for fraternizing with government and police officers. While in this future persecution context Petitioner is asserting that her persecution will be motivated by her escapee status and not for any previous fraternization, these reports still serve to bolster Petitioner's claim that the FARC is generally inclined to follow through on vendettas and mete out punishment for perceived transgressions of all sorts, and that such practices are systemic and pervasive.

The final question is whether this future persecution is likely to occur on account of a protected ground. The IJ determined that Petitioner's claim was not based on her "immutable characteristics," but we disagree. For the reasons explained *supra*, we accept that for purposes of future persecution, Petitioner is a member of the group, "women who have escaped involuntary servitude after being abducted and confined by the FARC," and that this is a "particular social group" under the INA. Thus, contrary to the IJ's finding, the action that Petitioner reasonably fears, reprisal from the FARC for having escaped, is inextricably linked to her status as an escapee. Her escapee status is immutable, and the record shows that the FARC is willing to carry out such retribution against deserters and escapees generally, including the specific example of Petitioner's own cousin. Petitioner has thus shown that she has a well-founded fear of future persecution on the ground that she belongs to the "particular social group" of "women who

33

have escaped involuntary servitude after being abducted and confined by the FARC."

The objective experiences of Petitioner's family members, the threats she herself has received, and the country reports detailing the FARC's tendency to take revenge for perceived wrongs against it, combine to satisfy the requirement that her fear of persecution be objectively reasonable. Thus, the BIA's determination that Petitioner did not have a well-founded fear of persecution on account of her particular social group was not supported by substantial evidence.[12]

However, the regulations state that "an applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality, . . . if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1). While Petitioner presented some evidence that the FARC's influence was pervasive in Colombia, and that she had already relocated a number of times and had still been consistently threatened, the BIA did not reach this issue below. Therefore, on remand, the BIA should consider the issue of relocation. *Lukwago*, 329 F.3d at 181.

---

[12]We have previously noted that "[a]s is often the case, [the petitioner's] political opinion argument is entwined with his social group claim." *Lukwago*, 329 F.3d at 181. Because we hold that Petitioner has established a well-founded fear of persecution based on her particular social group, it is not necessary to analyze the imputed political opinion claim.

34

## B.  WITHHOLDING OF REMOVAL

The standard for a claim of withholding of removal under INA § 241(b)(3) is higher than the standard for asylum. *Balasubramanrim v. INS*, 143 F.3d 157, 165 (3d Cir. 1998).  As with asylum, Petitioner must show that any persecution is on account of a protected ground, but in addition, she must show that such persecution is "more likely than not" to occur. *Lukwago*, 329 F.3d at 182.  Thus, an applicant who cannot meet the standard for asylum will necessarily be unable to meet the standard for withholding of removal.  *Id.*  Because we have determined that there is substantial evidence to support the conclusion that Petitioner has not shown past persecution, she cannot meet the standard for withholding of removal on this claim.

But we have determined that Petitioner has a well-founded fear of future persecution on the basis of her status as a former FARC prisoner who escaped.  Because the BIA rejected her withholding of removal claim with respect to future persecution when it rejected her asylum claim, upon remand, the BIA should give full consideration to Petitioner's withholding of removal claim with respect to future persecution, taking into account the fact that the threats she has received are directly related to her membership in a social group, "women who have escaped involuntary servitude after being abducted and confined by the FARC."

## C. PROTECTION UNDER THE CAT

Petitioner's final claim is for withholding of removal under the CAT. In order to succeed on this claim, she must show that it is more likely than not that she will be tortured if removed to Colombia, and that such torture will occur with the consent or acquiescence of the government. *Fadiga v. Att'y Gen.*, 488 F.3d 142, 160 n.4 (3d Cir. 2007). The "more likely than not" standard is equivalent to the "clear probability" standard used for withholding of removal, "and both standards are equivalent to a 'preponderance of the evidence.'" *Id.* (quoting *INS v. Stevic*, 467 U.S. 407, 424 & n.19 (1984)). Unlike her other two claims, Petitioner need not show that she is a "refugee" to sustain her CAT claim or that any torture was on account of a protected ground. *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007). The regulations define torture as

> "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

36

8 C.F.R. § 208.18(a)(1).

Here, the IJ denied Petitioner's CAT claim because she failed to show that she would be

> "personally at risk of torture at the hands of the government. To meet her burden of proof, an applicant must . . . establish that someone from the government and someone in her particular alleged circumstances is more likely than not to be tortured in the country designated for removal by the government. [Petitioner] here has made no such showing."

The IJ never reached the question whether it was more likely than not that Petitioner would be tortured if removed to Colombia. Rather, the decision apparently rested on the fact that Petitioner had not shown that any potential torture would occur "at the hands of the government."

This "at the hands of the government" language does not acknowledge that, under the regulations, Petitioner need only show that any torture will occur "at the instigation of or with the consent or acquiescence" of the government, and need not be directly carried out by the government's "hands." *See* 8 C.F.R. § 208.18(a)(1). For support, the IJ relied upon *Matter of S-V-*, a case which itself acknowledges that a CAT claimant may establish a claim based not only on torture at the instigation of the government, but also on consent or acquiescence of the government. 22 I. & N. Dec. at 1311 ("[R]egulations do require that the harm be inflicted by or at the instigation of or with the

consent or acquiescence of a public official or other person acting in an official capacity."). Even assuming that the IJ's reliance on this case indicates that she considered whether evidence in the record supported the risk of torture with the consent or acquiescence of the government, we altered the standard for acquiescence in *Silva-Rengifo*. 473 F.3d at 70 ("We are persuaded both by the foregoing history of the Convention's implementing legislation, and the sound logic of our sister circuit courts of appeals, that the definition of "acquiescence" adopted in *Matter of S-V-* was the wrong legal standard to apply.").

In *Silva-Rengifo*, we held that government acquiescence no longer required actual knowledge of torturous conduct. 473 F.3d at 65. We further stated:

> "The CAT does not require an alien to prove that the government in question approves of torture, or that it consents to it. Rather, as the court concluded in *Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003), an alien can satisfy the burden established for CAT relief by producing sufficient evidence that the government in question is willfully blind to such activities."

*Id*.

*Silva-Rengifo* was decided after the IJ's decision, but prior to the BIA's determination, and we must presume the BIA was aware of it. However, the BIA did not address either *Matter of S-V-* or *Silva-Rengifo*. The BIA instead issued a one-

38

sentence summary affirmance of the IJ's decision: "the record [does not] support the applicant's claim that she more likely than not faces torture in Colombia." Because of the BIA's lack of explanation for its decision, we have very little to review other than the decision of the IJ. As described above, the IJ's decision is likely erroneous on its face for failing to consider consent or acquiescence, and regardless, in light of the subsequent filing of *Silva-Rengifo*, the IJ at best applied the incorrect standard with respect to government acquiescence.

As in *Silva-Rengifo*, we will not now "review the evidence under the correct standard for acquiescence to determine if there is substantial evidence to support the BIA's conclusion that [Petitioner] does not qualify for relief under the Convention." 473 F.3d at 71 (citing *INS v. Ventura*, 537 U.S. 12 (2002) (per curiam)). Instead, we will remand to the BIA to give it an opportunity to better explain its decision.[13]

On remand, the BIA should consider whether Petitioner is more likely than not to be tortured by the FARC if removed to Colombia, and should apply the appropriate standard in determining whether the Colombian government is likely to be

---

[13]"[T]he availability of judicial review (which is specifically provided in the INA) necessarily contemplates something for us to review." *Abdulai v. Ashcroft*, 239 F.3d 542, 555 (3d Cir. 2001). When the BIA fails to adequately explain its reasoning, such that it becomes "impossible for us to review its rationale," we will vacate and remand for further explanation of the decision. *Id.*

willfully blind to Petitioner's risk of torture by the FARC. The BIA should consider that the record contains evidence that both the police officer and the military officer that Petitioner had been dating were aware of the fact she had been kidnapped and threatened, and even though both were government representatives, each told her that there was nothing they could do to protect her. Although these statements are different than filing an official police report without response, these men essentially told her that even if they went to the proper authorities, these authorities would do nothing to stop it. This may be circumstantial evidence that the Colombian government was willfully blind to such treatment and that to pursue official assistance would have been futile. *See Valdiviezo-Galdamez v. Att'y Gen.*, 502 F.3d 285, 293 (3d Cir. 2007) (finding that "the police ignored five reports filed by Galdamez concerning violence and threats by gang members" and that "[t]his could arguably constitute government 'acquiescence' to torture as we now know it").

The BIA should also consider the documentary evidence Petitioner submitted, including the State Department Report and the Amnesty International Report. The State Department Report specifically states that the government of Colombia was aware that the FARC routinely tortured, mutilated, and killed people. The Report illustrates that this problem is pervasive in Colombia, where paramilitaries sympathetic to the government often engage in similar activities with tacit approval from the government. The record also shows that there are often tacit non-aggression pacts between the groups in some regions. The mere fact that the Colombian government is engaged in a protracted civil war with the FARC does not necessarily mean

40

that it cannot remain willfully blind to the torturous acts of the FARC. Moreover, the record reveals that Colombian authorities have been especially slow to end abuses against women or bring perpetrators to justice. Such abuses include rape, sex slavery, mutilation and the like. There is also very little support for women who have been abused, and as Amnesty International reports, "[t]he response of the authorities . . . can be as abusive as the violence itself." The BIA should also consider whether Petitioner's past harm constitutes torture, and whether the apparent ability and inclination of the FARC to track Petitioner's movements increases the likelihood that she will actually be tortured in the future.

## IV. CONCLUSION

For the reasons set forth above, we will grant the petition in part and deny it in part. With respect to Petitioner's asylum claim, we will deny the petition to the extent that it is based on the past persecution claim. We will grant the petition with respect to Petitioner's well-founded fear of future persecution on account of her particular social group, "women who have escaped involuntary servitude after being abducted and confined by the FARC." We determine that she is a member of this group and that she has shown a well-founded fear of persecution based on this affiliation. However, we will remand to the BIA for further proceedings to determine whether Petitioner's relocation to another part of Colombia would mitigate the risk of persecution. On remand, the BIA should also consider Petitioner's withholding of removal claim with respect future persecution on account of her particular social group. We will also grant the petition with respect to the CAT claim,

41

specifically for reconsideration of this claim and application of the appropriate standard.  We will therefore remand to the BIA for further proceedings consistent with this opinion.