**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3252
_____

GURAM UNGIADZE,
                              Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A206-997-601)
Immigration Judge: Steven A. Morley
_____

Submitted Under Third Circuit L.A.R. 34.1(a):
September 13, 2023
_____

Before: JORDAN, BIBAS, and PORTER,
*Circuit Judges*.

(Filed: September 29, 2023)


_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

**PORTER**, *Circuit Judge*.

Guram Ungiadze came to the United States over ten years ago on a tourist visa and never left. Ungiadze conceded removability before the United States Immigration Court but applied for asylum, withholding of removal, and protections under the Convention Against Torture (CAT). Though Ungiadze's story is sympathetic, the Immigration Judge's (IJ) decision is supported by substantial evidence, so we will affirm.

I

Ungiadze was an officer and special forces operator in the Georgian military, serving in Kosovo, Iraq, and Afghanistan. Upon return from duty in 2009, Ungiadze was caught up in a military coup in his home country. He claims not to have participated in the coup, but he had family in the military who were accused of doing so. After Ungiadze refused to make false statements against certain family members, in February 2012 he was attacked by fellow servicemen and imprisoned for 15 days, during which he was deprived of adequate food and beaten daily. Finally, in early 2013, a new government came to power under the Georgian Dream Party.

That is where the controversy begins. Ungiadze says he was attacked again in August 2013 by new military leadership under the Georgian Dream government because he spoke out against pro-Russian elements of his government and was perceived loyal to the former government. But it is unclear whether and to what extent Ungiadze mentioned this second attack in his initial asylum interview. The interviewer did not include it in his notes. Ungiadze says he mentioned the second attack but admits that he did not go into

detail about it. Because he was not represented by counsel, he did not realize how much more detail he needed to provide.

The IJ did not dispute the account of Ungiadze's first assault and imprisonment. In fact, he agreed that those facts were sufficient to establish persecution under the *old* Georgian government. But when Ungiadze raised the issue of the second attack at his hearing, the IJ deemed it incredible that he could have mentioned it to the interviewer because the interview notes are silent. Nor did the IJ accept Ungiadze's explanation that his omission was due to lack of counsel.

The IJ discounted the testimony of Ungiadze's wife and mother in part because they are interested parties. Two of Ungiadze's friends testified. Valodia Bendeliani mentioned the February 2012 attack but not the August 2013 attack. Amiran Tsertsvadze did mention the 2013 attack, but the IJ discounted his testimony because Tsertsvadze could not explain why Ungiadze himself failed to mention it earlier.

Finally, documentation from a hospital visit in August 2013 was produced courtesy of two of Ungiadze's friends who claim to have procured it from the hospital where Ungiadze says he was treated. One of the friends signed a letter testifying to its authenticity. But the IJ did not give the document significant weight, as its origins could not be traced.

II[1]

A

To obtain asylum, an applicant bears the burden of demonstrating a "well-founded fear of persecution" based on his political opinion or "membership in a particular social group." *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 544 (3d Cir. 2018); 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). For withholding of removal, the applicant must establish "a clear probability of persecution" based on a protected ground. *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011). CAT relief is available if it is likely that the applicant "would be tortured if removed to the proposed country of removal." *Id.*

Ungiadze's claim to asylum and withholding of removal is based on a fear of persecution for his political opinion—in particular, his outspoken opposition to pro-Russian elements of his government. His fear of torture is based on his perceived loyalty

---

[1] The Board has jurisdiction to entertain appeals from IJ decisions under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction to review BIA orders under 8 U.S.C. § 1252. We review the Board's decision under the deferential substantial-evidence standard. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Under this standard, we will reverse only if "no reasonable fact finder could make that finding on the administrative record." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003). Factual findings "will be upheld to the extent that they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 597 (3d Cir. 2003) (quoted source omitted). Legal conclusions are reviewed de novo. *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 339 (3d Cir. 2008). "Insofar as the BIA adopted the findings of the IJ, we must review the decision of the IJ." *Sukwanputra v. Gonzales*, 434 F.3d 627, 631 (3d Cir. 2006).

to members of the former Georgian military leadership against whom he refused to testify.

In denying Ungiadze's claim for asylum, withholding of removal, and CAT, the IJ based his decision on a credibility determination. App. 25. "Respondent's testimony on key aspects of his asylum claim," the IJ wrote, "varied significantly from the documentary evidence in the record, particularly his asylum interview." *Id.* In particular, the IJ doubted that Ungiadze would have failed to mention such a significant instance of persecution by the new government. *Id.* He thus refused to credit Ungiadze's testimony. *Id.*

We review the IJ's credibility determination under the substantial-evidence standard. *Dia v. Ashcroft*, 353 F.3d 228, 247 (3d Cir. 2003). "Considering the totality of the circumstances, and all relevant factors," under the Immigration and Nationality Act,

> a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements[,] . . . the internal consistency of each such statement, the consistency of such statements with other evidence of record[,] . . . and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).

On review, "[w]e look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony . . . in view of the background evidence on country conditions." *Sukwanputra v. Gonzalez*, 434 F.3d 627, 636 (3d Cir. 2006) (quoting *Dia*, 353 F.3d at

249). There is nothing in the record to definitively discredit Ungiadze's story, and we take no position on its truth or falsity. On the one hand, it does seem that if he suffered two assaults instead of one he would have emphasized it in his initial interview and the interviewer would have recorded it. But even honest applicants can make bad witnesses on their own behalf, especially when uncounseled, and interviewers' records are not verbatim.

That said, nothing here compels the conclusion that Ungiadze was credible. Under our substantial-evidence standard, failure to mention the only attack allegedly carried out by the current Georgian government provides substantial evidence for the IJ's holding. His omission of such a significant occurrence troubled the IJ, and his doubt is a basis for denial. *Dia*, 353 F.3d at 247 ("An alien's credibility, by itself, may satisfy his burden, or doom his claim.").

The record also lacks evidence of country conditions supporting Ungiadze's testimony. The IJ assessed country conditions based on the evidence presented below. App. 31. He concluded that given the political transition from a pro-Russian to anti-Russian government, Ungiadze "personally benefitted by the change in government as he was reinstated to his position of authority in the military." *Id.* He further found that Ungiadze's fears of being intimidated into testifying were unsubstantiated, as the persons against whom he was allegedly pressured to testify have already been tried and either convicted, acquitted, or charged. That is substantial evidence.

Finally, Ungiadze points to the hospital letter as evidence of the alleged second assault. The IJ rejected this evidence, "doubt[ing] the authenticity of [the] document."

6

App. 28. We have previously expressed some concern about overly demanding requirements for documentary evidence in these circumstances. *See Senathirajah v. INS*, 157 F.3d 210, 215–16 (3d Cir. 1998). But the hospital letter was not retained or discarded during a hurried flight from detention, torture, and persecution. It was obtained a decade later, contemporaneous to his asylum proceedings, when the exigencies of the moment had long abated. The IJ's treatment of the document does not implicate *Senathirajah*'s concerns.

## III

We will deny the petition for review.