**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1444
_____


HECTOR DAVID TIPAN LOPEZ,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. BIA-1: A246-618-807)
Immigration Judge: Adam Panopoulos

_____


Argued on January 22, 2025

Before: HARDIMAN, McKEE, and AMBRO, <u>Circuit Judges</u>


(Opinion filed: June 30, 2025)

Rebecca Hufstader
Robert Jackel **(Argued)**
Emily G. Thornton
Legal Services of New Jersey
100 Metroplex Drive
Suite 402
Edison, NJ 08818

    *Counsel for Petitioner*

Pamela Bondi
Laura H. Hickein
Russel J. Verby **(Argued)**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

    *Counsel for Respondent*

Anne K. Dutton
University of California College of the Law, San Francisco
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102

    *Counsel for Amicus-Petitioner*

_____

OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>

Hector David Tipan Lopez suffered persecution at the hands of a local gang, the Lobos, in his home country of Ecuador. He came to the United States and sought asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(1)(A), as well as protection under the United Nations Convention Against Torture and Other Cruel, Inhumane and Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 ("CAT"); 8 C.F.R. §§ 1208.16–1208.18 (implementing regulations). He petitions us for review of his final order of removal by the Board of Immigration Appeals ("BIA").

The INA requires an asylum seeker to "establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting" him. 8 U.S.C. § 1158(b)(1)(B)(i). Tipan Lopez argued that he had been persecuted on three of these grounds: religion, race, and political opinion. An Immigration Judge (IJ) denied his application, and the BIA affirmed. He petitions us for review of (1) whether the BIA applied the right legal standard for the nexus between his persecution and his religion and (2) whether substantial evidence supported the BIA's decision that there was no connection between his persecution and any of his protected

3

characteristics. We remand the religious-nexus question to the BIA with instructions not to apply the following:

- a subordination-based test, which rejects a protected ground as a central reason for persecution if it is subordinate to an unprotected reason; or

- an animus-based test requiring a persecutor to show hostility toward a protected ground for it to count as a central reason.

We therefore do not reach whether substantial evidence supported the BIA's no-nexus-with-religion finding. We deny Tipan Lopez's petition for review as to the BIA's no-nexus findings for race and political opinion.

The CAT requires applicants to show that "it is more likely than not . . . [they] would be tortured if removed to the proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and the torture would happen "with the consent or acquiescence of[] a public official," *id.* § 1208.18(a)(1). We remand Tipan Lopez's CAT claim for the BIA to determine whether Ecuador can protect him from torture, a determination relevant to acquiescence that the BIA did not make.

## I. BACKGROUND

### A. Factual Background

Tipan Lopez is from Quito, Ecuador, where he lived until 2023. In 2016, he converted to Evangelical Christianity. Motivated by his new faith, he began encouraging young drug addicts to stop drug use. The Lobos were a local gang that

4

dealt drugs. Concerned that Tipan Lopez was hurting their drug sales, they targeted him over several years to stop his evangelizing.

- They robbed him of $600, his phone, his glasses, and his jewelry in December 2020.

- A month later, they castigated him for "preaching the word of God" because it decreased their drug sales, kidnapped him, took him to a deserted area, beat him, robbed him, and shot him through the finger.

- In April 2021, the Lobos broke his clavicle and stabbed him in the neck.

- They showed him the following August that the entire gang had his picture and then broke a bottle and used it to cut his arm.

- The intimidation continued in the ensuing months. The gang demanded $10,000 from Tipan Lopez to make up for lost sales, cut his leg, and burned his hand with a cigarette.

- They then robbed him and shot him in the hip in early 2022.

- They tore out one of his fingernails with pliers and put a bag full of pepper spray over his head in September 2022.

- Two months later, they caused him to crash his car during a vehicle chase and then robbed and threatened to kill him and to impale his rectum.

5

Tipan Lopez did not seek medical care or make a police report after any of these incidents. He distrusted the police because he had heard about and seen them taking bribes and letting criminals go free.[1]

Motivated by the threats from the Lobos, Tipan Lopez entered the United States in February 2023 without inspection. He believed returning to any part of Ecuador could result in his torture and death at the hands of the Lobos.

B.    Procedural History

The Department of Homeland Security began removal proceedings after Tipan Lopez's arrest for domestic violence in March 2023. In June 2023, he applied for asylum and withholding of removal under the INA and protection under the CAT.

The IJ denied relief in September 2023. He first found that Tipan Lopez was credible, "corroborated his claim with personal evidence and background country conditions," and had suffered persecution. Administrative Record (AR) 78. The IJ then examined whether Tipan Lopez had "establish[ed] that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for" his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). He determined that Tipan Lopez's religion was not a central reason for his past or feared future persecution. The Lobos "made it clear to [Tipan Lopez] that

---

[1]    The dissent notes that Tipan Lopez "never reported his alleged torture to the police," but does not note the reasons why. Diss. Op. at 14.

they knew . . . [he] was speaking about his faith to other people," AR 79, but their "animus towards [him] was driven by anger that they could not sell drugs to as many people as they had in the past," AR 81.

The IJ also ruled that there was no nexus between Tipan Lopez's race and his persecution because "[t]he mere fact that [he] was insulted [with a racial slur] during these encounters [with the Lobos] does not indicate that race was a central reason for why the physical attacks occurred." AR 80. As for political opinion, the IJ ruled that "the evidence does not show that [Tipan Lopez] was communicating an opinion against gang authority in Ecuador, such that the court can infer that [his] actions were perceived by his persecutor as an expression of any political opinion held by [him]." AR 82–83.

In reviewing the CAT claim, the IJ assumed it was more likely than not that the Lobos would target Tipan Lopez if he returned to Ecuador and that their anticipated conduct would constitute torture. Yet, Tipan Lopez failed to show acquiescence by public officials because: (1) he did not make police reports or show that the government would willfully ignore his torture; (2) bragging statements by the Lobos that they controlled the police could not establish that their control was real; (3) Tipan Lopez's personal observations about the police were general and unsupported; and (4) despite gang influence on the government, Ecuador is making significant efforts to crack down on gangs. In short, "the evidence show[ed] that the government of Ecuador identifie[d] such instances of [gang-related] corruption and attempt[ed] to root it out." AR 85. The IJ therefore concluded that "Ecuadorian police authorities would respond to [Tipan Lopez's] expression of fear of harm from the Lobos, and that . . . likely response

7

would not demonstrate consent, acquiescence, or willful blindness." AR 86.

Tipan Lopez appealed the IJ's decision to the BIA. It affirmed, characterizing Tipan Lopez's religion as, "at most, incidental or tangential to more commonplace goals, including financial gain and furthering, or preventing interference in, a criminal enterprise." AR 4 (quoting *In re M-R-M-S-*, 28 I.&N. Dec. 757, 760 (B.I.A. 2023)). It also relied on *M-R-M-S-* to reject principles from Fourth Circuit cases on which Tipan Lopez had relied. Those cases held that a subordination-based test for nexus—to repeat, rejecting a protected ground as a central reason for persecution if it is subordinate to an unprotected reason—is impermissible. Similarly, the BIA found that Tipan Lopez's race and political opinions were not central reasons for his persecution, relying on the IJ's reasoning.

As for the CAT claim, the BIA found no clear error in the IJ's finding that the Ecuadorian government would respond appropriately to Tipan Lopez's situation if he reported it. The BIA also agreed with the IJ's conclusion that Tipan Lopez failed to demonstrate acquiescence by the Ecuadorian government.

## II.    JURISDICTION & STANDARD OF REVIEW

The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b)(3), 1240.15. Tipan Lopez timely petitioned us for review. *See* 8 U.S.C. § 1252(b)(1). We have jurisdiction to review final orders of removal under § 1252(a)(1), (a)(5), and venue is proper in this Circuit because the removal proceeding took place in New Jersey, *id.* § 1252(b)(2).

We review both the BIA's and the IJ's opinions when "the BIA has substantially relied on" the latter. *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020) (internal quotation marks omitted). That review is *de novo* on whether the BIA applied the right legal standard for religious nexus, *see id.*, but the BIA's factual findings are reviewed under the substantial-evidence standard, which requires that we deny a petition for review "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). That standard applies to the BIA's factual findings related to the nexus between Tipan Lopez's persecution and his religion, race, and political opinions.

The CAT claim falls under two standards of review:

A Convention claimant must satisfy a two-pronged test, showing both that (1) if he returned home, he would be tortured, and (2) the government would acquiesce to that torture. *Myrie v. Att'y Gen.*, 855 F.3d 509, 516–17 (3d Cir. 2017). We have made clear that each prong has two steps. *Id.* For Prong 1, an immigration judge must ask: (1A) What harm will the claimant likely suffer if he returns home? and (1B) Would that harm amount to torture? *Id.* For Prong 2, the judge asks: (2A) How will public officials likely respond to that harm? and (2B) Would that response amount to acquiescence? *Id.* Steps 1A and 2A are factual questions, so the [BIA] must review them for clear error. *Id.* And Steps 1B and 2B are legal questions, so the [BIA] must review them de novo. *Id.*

9

*Llanes-Quinteros v. Att'y Gen.*, No. 22-1036, 2023 WL 4116625, at \*1 (3d Cir. June 22, 2023); *see Myrie*, 855 F.3d at 516–17. We review steps 1A and 2A for substantial evidence and steps 1B and 2B *de novo*. *See Figueroa v. Att'y Gen.*, 998 F.3d 77, 93 (3d Cir. 2021).

## III.   ANALYSIS

### A.   Legal Standard for Nexus between Religion and Persecution

#### 1.   Subordination-Based Test for Nexus

The BIA had defined "one central reason" as any reason that is not "incidental, tangential, superficial, or subordinate to another reason for harm." *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 214 (B.I.A. 2007). But our Court rejected the "subordinate" part of that test in *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124 (3d Cir. 2009), concluding that

> the mixed-motives analysis [of nexus] should not depend on a hierarchy of motivations in which one is dominant and the rest are subordinate .... [A] persecutor may have more than one central motivation for his or her actions; whether one of those central reasons is more or less important than another is irrelevant.

*Id.* at 129. "[T]he presence of multiple motivations for persecution ... is not disqualifying." *Ghanem v. Att'y Gen.*, 14 F.4th 237, 247 (3d Cir. 2021).

10

The BIA here relied on *M-R-M-S-*. Tipan Lopez points out that *M-R-M-S-* quoted the rejected "subordinate to another reason" language. 28 I. & N. Dec. at 759 (quoting *J-B-N- & S-M-*, 24 I. & N. Dec. at 214); *see also id.* at 762 ("If a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental *or subordinate to* that other ultimate goal and therefore not one central reason for the harm." (emphasis added)). The BIA in *M-R-M-S-* acknowledged that this subordination-based test conflicted with Third Circuit law but applied it anyway. *See id.* at 759 n.6 ("Although the United States Court of Appeals for the Third Circuit generally agrees with the [BIA's] interpretation of the 'one central reason' standard, it has rejected the requirement that a protected ground not be subordinate to another reason for harm.").

Tipan Lopez contends that the BIA impermissibly applied that test to his case.[2] The Government responds that the BIA's decision here did not rely on the subordination-based test from *M-R-M-S-*, instead citing the case only for other propositions.

Tipan Lopez has the better argument. In a footnote, the BIA's decision explained that *M-R-M-S-* rejected principles from Fourth Circuit cases on which Tipan Lopez relied. *See* AR 4 n.2. Those cases, which he cited in his briefing before the BIA, held that a subordination-based test for nexus is impermissible. *See* AR 18 (citing *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019) ("The protected ground need not

---

[2] He also contends that *M-R-M-S-* is limited to family-based claims. We need not reach that issue.

11

be the only reason—or even the dominant or primary reason—for the persecution.")); AR 22 (citing *Perez Vasquez v. Garland*, 4 F.4th 213, 225 (4th Cir. 2021) (holding that a protected ground can still be a central reason even if it is intertwined with monetary motives)). Analyzing that footnote in context, the BIA did rely on the subordination-based test from *M-R-M-S-*, contrary to our precedent.

The Government also suggests that intervening decisions have overruled or modified our precedent on subordination. It emphasizes cases establishing that "[f]or a protected characteristic to qualify as 'one central reason,' it must be an essential or principal reason for the persecution." *Thayalan v. Att'y Gen.*, 997 F.3d 132, 142 (3d Cir. 2021) (quoting *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 (3d Cir. 2015)). But the cases do not conflict. In the same sentence that *Gonzalez-Posadas* outlines the "essential or principal" test, it also favorably quotes the test from *Ndayshimiye*. *Gonzalez-Posadas*, 781 F.3d at 685. *Thayalan* and *Gonzalez-Posadas* define "central" as "essential or principal," and *Ndayshimiye* holds that, among multiple central reasons, one cannot be discounted because it is subordinate to another.[3]

The dissent suggests that we use "guilt-by-citation reasoning" to conclude that "the [BIA] committed legal error

---

[3] Further, "to the extent that [a newer case] is read to be inconsistent with earlier case law, the earlier case law . . . controls." *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 278 n.8 (3d Cir. 2001). Even if there were a conflict between *Ndayshimiye* (2009) and *Thayalan* (2021) or *Gonzalez-Posadas* (2015), *Ndayshimiye* would control.

12

simply by citing *M-R-M-S-*." Diss. Op. at 4. Not so. The BIA used *M-R-M-S-* to reject Fourth Circuit cases, which themselves rejected a subordination-based test for nexus. Its "double negative" amounts to the BIA adopting that test, which is directly contrary to our precedents. Our dissenting colleague thinks it is "a stretch" for us to rely on "a single citation in a footnote" because we cannot find "an improper quotation in the [BIA's] opinion." Diss. Op. at 5. To be sure, if the BIA had directly relied on the language in *M-R-M-S-* that we expressly rejected, its error would be obvious. As it stands now, we must analyze (1) the BIA's citation to *M-R-M-S-* in a footnote, (2) citations from Tipan Lopez's brief before the BIA to Fourth Circuit cases that this footnote alludes to but does not cite, and (3) the Fourth Circuit decisions themselves, to understand the error. That it is hidden makes it no less erroneous. If anything, it raises suspicion that something is amiss.

The dissent argues further that those Fourth Circuit cases are inconsistent with our Court's precedents. It focuses on one proposition for which Tipan Lopez cited *Alvarez Lagos*, 927 F.3d at 250, in his briefing before the BIA: that nexus is satisfied when "the protected ground is the reason that an individual, and not someone else, is targeted for persecution." AR 18. But, contrary to the dissent, that is not the only proposition for which Tipan Lopez cited the case.[4] Indeed, in

---

[4] Our dissenting colleague suggests that we treat citing a case as sufficient to raise all arguments that flow from it. Diss. Op. at 5–6. To the contrary, we are addressing the specific propositions for which Lopez cited *Alvarez Lagos.* Moreover, the pages of *M-R-M-S-* that the Board cited in rejecting Tipan Lopez's appeal focused not only on but-for

the very same paragraph, he also used *Alvarez Lagos* to argue that "[t]he protected ground need not be the only reason—or even the dominant or primary reason—for the persecution." 927 F.3d at 250. As explained above, that is exactly what we held in *Ndayshimiye*, 557 F.3d at 129 ("[T]he mixed-motives analysis [of nexus] should not depend on a hierarchy of motivations in which one is dominant and the rest are subordinate."). By using *M-R-M-S-* (which directly conflicts with *Ndayshimiye*) to reject *Alvarez Lagos* (which has the same relevant holding as *Ndayshimiye*), the BIA rejects *Ndayshimiye*.

As for *Perez Vasquez*, the dissent may be right that its analysis of "intertwined explanations for persecution" conflicts with our precedent. Diss. Op. at 11. But that is not what the BIA used *M-R-M-S-* to reject in our case. The portion of *M-R-M-S-* that the BIA cites, AR 4 n.2, concluded that "[i]f a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or *subordinate to* that other ultimate goal and therefore not one central reason for the harm," 28 I. & N. Dec. at 762 (emphasis added). As with *Alvarez Lagos*, the BIA's rejection of *Perez Vasquez* implicitly adopted a subordination-based test.

---

causal reasoning, but also on a subordination-based test. *See* 28 I. & N. Dec. at 761 (characterizing the Fourth Circuit's precedent as "expand[ing] the nexus inquiry to include family status as a central reason even when it is 'incidental' and '*subordinate to* another reason for harm'" (emphasis added, internal citation and quotation marks omitted)); *contra* Diss. Op. at 6 n.1.

14

In short, the BIA relied on a subordination-based test that our Court has rejected. Its argument that our Court implicitly overturned that rejection fails. We thus remand the nexus determination for religion to the BIA with instructions not to apply a subordination-based test, and instead to apply the legal standard from *Ndayshimiye* and *Ghanem*.

### 2. Animus-Based Test for Nexus

Tipan Lopez, alongside the Center for Gender and Refugee Studies as an *amicus curiae*, contends that the IJ misinterpreted the nexus test by requiring hostility by the persecutor against the protected ground. In immigration law, this is called an animus-based test. The Government did not respond to this contention.

The IJ indeed applied an impermissible animus-based test for nexus. The plain language of the statute requires only that a protected characteristic is "at least one central reason" for the harm. 8 U.S.C. § 1158(b)(1)(B)(i). Moreover, the BIA has rejected a hostility requirement for nexus. *See In re Kasinga*, 21 I. & N. Dec. 357, 365 (B.I.A. 1996) (en banc) ("[S]ubjective 'punitive' or 'malignant' intent is not required for harm to constitute persecution."). The Department of Homeland Security's prevailing interpretation agrees. *See* USCIS: RAIO DIRECTORATE – LESSON PLAN, NEXUS AND THE PROTECTED GROUNDS, at 11 (Jan. 30, 2025) ("Punitive or malignant intent, or an intent to overcome the protected trait, . . . is not required for an applicant to establish a nexus to a protected ground."). International law authorities suggest the same. *See* UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status, HCR/1P/4/ENG/REV.4, at 176 (Feb. 2019) ("There is no need for the persecutor to have a

15

punitive intent to establish the causal link. The focus is on the reasons for the applicant's feared [harm] within the overall context of the case, and how he or she would experience the harm rather than on the mind-set of the perpetrator.").[5]

Declining to require animus by the persecutor also makes sense on a practical level. A protected ground can motivate persecution even when the persecutor has no hostility toward that ground. For instance, gang members might attack an indigenous person because they want him to join their gang. In doing so, they might leverage to their advantage negative stereotypes or impediments he experiences as a result of his indigenous identity, not because of a dislike of indigenous people. *See Saban-Cach v. Att'y Gen.*, 58 F.4th 716, 732 (3d Cir. 2023). Or a terrorist might target an escapee's family member to force the escapee to return, not because of any animosity toward the family. *See Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993). Requiring animus would allow these forms of persecution against protected grounds to slip through the cracks.

The IJ, in a portion of his decision adopted by the BIA, found no nexus between religion and persecution because Tipan Lopez had "not met his burden of proving that the gang was motivated to harm him on each of these occasions *because of animus against his race or his religious faith*." AR 80

---

[5] International law is relevant because Congress created our national asylum process to align with international refugee law. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987).

16

(emphasis added).[6]  This legal standard for nexus is incorrect because it imposes an animus element that is not required.

Our dissenting colleague believes "the IJ used 'animus' as a shorthand for the proper (objective) legal standard [the "one central reason" standard], not as a heightened supplement to it."  Diss. Op. at 7.  In support of that proposition, he points to cases outside the immigration context that use the word "animus" in the way he favors, as well as out-of-circuit authority and one immigration opinion from our Court.  *Id.* at 6–9.

The cases outside the immigration context are irrelevant.  We are operating in a field of law—immigration—in which "animus" has a specific meaning.  *See, e.g.*, *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 668 (6th Cir. 2024) (describing "animus or hostility" and "animus or hatred" in the nexus context); *Orellana-Recinos v. Garland*, 993 F.3d 851 (10th Cir. 2021) (quoting an IJ who described "tak[ing] animus out on" someone, which only makes sense if animus is defined as hatred or hostility, not as intent or motivation (brackets omitted)).

The dissent's out-of-circuit authority notes that it is "not entirely clear what the BIA and some of our sister circuits mean by 'animus,'" but then goes on to offer only one explicit definition of the term: "hatred of, or antagonism toward," a trait.  *Pineda-Maldonado v. Garland*, 91 F.4th 76, 89 n.4 (1st Cir. 2024).  Finally, the precedential opinion from our Court

---

[6]  Tipan Lopez only challenges the legal standard for nexus with respect to his religion claim, not his race or political-opinion claims.

that the dissent cites, *Ghanem*, seems to use "animus" to mean "hatred." 14 F.4th at 247. The relevant passage describes how "the animus toward Ghanem extended far beyond his family's manifestations of displeasure." *Id.* In that phrase, "hatred or hostility toward Ghanem" would also work. Using our dissenting colleague's preferred definition—"intent or motivation toward Ghanem"—makes little sense. In short, "animus," widely recognized as the incorrect legal standard, is not an implicit and generic shorthand for the appropriate one, the "one central reason" standard.

In sum, by relying on both subordination- and animus-based tests, the IJ and the BIA applied the wrong legal standards for the nexus between religion and persecution. We grant Tipan Lopez's petition for review as to the no-nexus-with-religion finding and remand to the BIA to reconsider the issue without applying either impermissible test.

### 3. Harmless Error

Our dissenting colleague suggests that even if the BIA used the wrong legal standard for nexus, we can affirm because the error was harmless. Diss. Op. at 9. We disagree. We apply harmless error in immigration cases when "it is highly probable that the error did not affect the outcome of the case." *Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011). That high standard is not met here. The dissent emphasizes that the persecutors' motivations matter, not the petitioner's. Diss. Op. at 10. But the Lobos castigated Tipan Lopez for "preaching the word of God," AR 152, and brought up his religious views and motivations on more than one occasion, AR 147.

18

If the IJ assessed whether the Lobos hated Tipan Lopez because of his Evangelical Christian beliefs, perhaps it made sense to conclude they did not hold such animus. The same could be said for the BIA's implicit adoption of a subordination-based test; under the deferential substantial-evidence standard, the record might support the position that religion was subordinate to monetary motives. But if the BIA and IJ had to reexamine the evidence using neither a subordination- nor an animus-based test, the case could come out differently. It is not our role to make that determination in the first instance. *INS v. Ventura*, 537 U.S. 12, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."). We thus remand.

### B.    Substantial Evidence for Nexus[7]

#### 1.    Race

Tipan Lopez has indigenous heritage. He presented evidence that indigenous people face discrimination in Ecuador and that he struggled with such discrimination during his education and professional life. The Lobos used a racial slur against indigenous people when they first targeted Tipan Lopez. But he presented no further evidence that the attacks were connected to his race. We therefore deny his petition for review of the link between his persecution and race. Tipan Lopez does not demonstrate that race was a "central reason"

---

[7]    Because the BIA applied the wrong legal standard for nexus to the religion claim, we need not assess whether substantial evidence supported its no-nexus finding. We instead remand that issue to the BIA.

for his persecution under 8 U.S.C. § 1158(b)(1)(B)(i). Based on the "incidental, tangential, or superficial role" test from *Ndayshimiye*, 557 F.3d at 130, the racial slur was merely incidental to the persecution. Substantial evidence supported the IJ and the BIA's finding.

### 2. Political Opinions

Tipan Lopez contends that gangs in Ecuador are political actors given their influence in government and that his anti-drug activity amounted to an expression of an anti-gang political opinion. In support of that position, he cites record evidence that he opposed drug addiction, that the Ecuadorian government failed to respond to addiction, that the police were corrupt, and that gangs were politically powerful in Ecuador. The Government points out that Tipan Lopez does not argue (nor would the evidence support) that the Lobos imputed an anti-gang political opinion to him. It also emphasizes that opposition to addiction motivated him more than opposition to dealing, so finding that he held an anti-gang political opinion involves an inferential leap.

Our review asks whether substantial evidence supports this finding. The IJ concluded that "[e]ven though [Tipan Lopez] expressed an opinion against drugs, it does not logically follow that such an opinion automatically amounts to an expression of an anti-drug gang political opinion." AR 82. The Lobos "knew [Tipan Lopez] was telling people not to do drugs, but the evidence does not show that [he] was communicating an opinion against gang authority in Ecuador, such that the court can infer that [his] actions were perceived by his persecutor as an expression of any political opinion held by [him]." AR 82–83.

"Holding a political opinion, without more, is not sufficient to show persecution on account of that political opinion . . . . There must be evidence that the gang knew of [the applicant's] political opinion and targeted him because of it." *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 609 (3d Cir. 2011) (internal citation omitted). A reasonable IJ could find that the evidence does not establish knowledge or targeting in Tipan Lopez's case.

C.     CAT Claim

"No State Party shall expel, return . . . or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture, art. III, 23 I.L.M. 1027, 1028 (1984). "The burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2); *see also Sevoian v. Ashcroft*, 290 F.3d 166, 174–75 (3d Cir. 2002) (applying the standard from § 1208.16(c)(2)). If Tipan Lopez shows that it is more likely than not he would be tortured on returning to Ecuador, he then must establish that the torture would be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Put simply, would the official yield to or accept the torture occurring?

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have

21

awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Herrow v. Att'y Gen.*, 93 F.4th 107, 116 (3d Cir. 2024) (quoting 8 C.F.R. § 1208.18(a)(7)). An asylum seeker can establish acquiescence by showing willful blindness from his home government. *Id.* at 116–17. In making such a determination, the agency must consider first "how public officials will likely act in response to the harm the petitioner fears," and second, "whether the likely response from public officials qualifies as acquiescence." *Myrie*, 855 F.3d at 516. We review the first question for substantial evidence and the second *de novo*. *Id.* at 516–17; *Llanes-Quinteros*, 2023 WL 4116625, at *1 (citations omitted).

The IJ assumed, as do we, that Tipan Lopez established it is more likely than not he would be tortured if he returned to Ecuador. *See id.* (outlining this consideration as the first step of the analysis). As to Ecuador's likely response, the IJ first made factual findings that Ecuador "identifies" and "attempts to root . . . out" corruption. AR 85. Tipan Lopez did not communicate with the police, so the IJ relied on the general conditions of the country. Ecuador has a high murder rate, with gang involvement in politics and a crisis of gang violence. But in response to this situation, the Ecuadorian government declared a state of emergency, created a joint taskforce between the military and police to target gang activity, and allowed the police to use more force when confronting gang activity. A reasonable adjudicator could conclude, as the IJ did, that Ecuador is attempting to address gang violence, satisfying the substantial-evidence standard that applies to factual findings.

22

Having made that finding about how officials would respond to Tipan Lopez's torture, the IJ then ruled as a matter of law that the response would not qualify as acquiescence. We have instructed IJs and the BIA not to focus on efforts over outcomes. *Quinteros v. Att'y Gen.*, 945 F.3d 772, 788 (3d Cir. 2019). In other words, it matters whether a government can prevent torture, not just whether it is trying. *See, e.g.*, *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 312 (3d Cir. 2011); *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 351 (3d Cir. 2008).[8] Efforts notwithstanding, the BIA is "required to consider whether the government . . . is capable of preventing the harm." *Quinteros*, 945 F.3d at 788.

The dissent does not read *Quinteros* to stand for the proposition that "fervent but unsuccessful resistance to torture" can be acquiescence. Diss. Op. at 13 n.4. We disagree. When we told the BIA "to consider whether the government . . . is capable of preventing the harm," *Quinteros*, 945 F.3d at 788, we did not include a bad-faith requirement. We asked about the home government's ability, not its intentions. Perhaps that is why our dissenting colleague seems to acknowledge that his position may require "revisit[ing]" *Quinteros*'s holding. Diss. Op. at 13 n.4. The dissent also suggests that the IJ's predictive

---

[8] The dissent emphasizes that government officials in *Gomez-Zuluaga* "were aware of the fact [the petitioner] had been kidnapped and threatened," Diss. Op. 12 (quoting 527 F.3d at 350–51), but these officials were a "police officer" and "military officer" that she "had been dating," 527 F.3d at 350–51. This was "different than filing an official police report without response," and we merely suggested that, on remand, those facts "may be circumstantial evidence" of acquiescence. *Id.* at 351.

23

finding suffices for consideration of whether Ecuador *can* prevent harm to Tipan Lopez. *Id.* at 13 n.5. We again see things differently. That is the IJ's conclusion, but the underlying reasoning applied the wrong legal standard, impermissibly considering only efforts, not outcomes.

The IJ here noted attempts, not results, and found only that Ecuador is trying to root out gang-related corruption, not that it is succeeding. We therefore grant Tipan Lopez's petition for review as to the CAT claim and remand for the BIA to analyze whether Ecuador can prevent the harm he would likely face. Based on its finding, the BIA must then consider whether Ecuador would acquiesce to his torture.

\* \* \*

We grant Tipan Lopez's petition for review as to the BIA's no-nexus finding between his religion and his persecution, and we remand for it to reconsider the issue without applying subordination- or animus-based tests. We also grant the petition as to the BIA's determination that Ecuador will not acquiesce to his torture. We remand for it to determine in the first instance whether Ecuador can protect him from torture and then to reconsider whether Ecuador would acquiesce to his torture. We deny Tipan Lopez's petition for review of the BIA's no-nexus finding between his persecution and his race or political opinions.

24

*Hector David Tipan Lopez v. Attorney General*, No. 24-1444

HARDIMAN, *Circuit Judge*, concurring in part and dissenting in part.

Hector David Tipan Lopez seeks review of a Board of Immigration Appeals decision denying his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). I would hold that the Board applied the correct legal standards in adjudicating these claims and that substantial evidence supported its factual determinations. Because the majority reaches that result only on Tipan Lopez's race and political opinion asylum claims, I respectfully dissent in part.

I

A

To gain asylum, Tipan Lopez must show "a nexus between the alleged protected grounds and the feared or past persecution." *Hernandez Garmendia v. Att'y Gen.*, 28 F.4th 476, 483 (3d Cir. 2022). When an asylum seeker alleges that his persecutor harbors multiple motivations, the Immigration and Nationality Act (INA) requires him to "establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for" the persecution. 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

We addressed the "one central reason" requirement in *Ndayshimiye v. Attorney General*, 557 F.3d 124 (3d Cir. 2009). There, the Board had interpreted "one central reason" to

1

exclude persecutorial motives that are "incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* at 128 (citation omitted). We rejected that definition in part, holding that "one central reason" does not exclude motivations that are "subordinate to" other reasons for persecution. *Id.* at 129. We explained that "the mixed-motives analysis should not depend on a hierarchy of motivations." *Id.* Because the "plain language" of the INA "indicates that a persecutor may have more than one central motivation for his or her actions," it is "irrelevant" that "one of those central reasons is more or less important than another." *Id.* So we rejected a subordination-based test for evaluating mixed-motive asylum claims. *Id.* at 129–30.

We also made clear that not all alleged persecutory motives satisfy the nexus requirement. In mixed-motive cases, an asylum applicant still must show that an impermissible motivation was a "central" reason for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). So we agreed with the Board that "incidental, tangential, or superficial" reasons for persecution do not satisfy the nexus requirement. *Ndayshimiye,* 557 F.3d at 130.

Subsequent decisions of this Court reaffirmed the *Ndayshimiye* rule. *See, e.g., Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 (3d Cir. 2015) ("For a protected characteristic to qualify as 'one central reason', it must be an essential or principal reason for the persecution."); *Thayalan v. Att'y Gen.*, 997 F.3d 132, 142–43 (3d Cir. 2021) ("The characteristic must be *both* a but-for cause of the persecution *and* it must play more than a minor role that is neither incidental nor tangential to another reason for the harm or a means to a non-protected end." (cleaned up)); *Ghanem v. Att'y Gen.*, 14 F.4th 237, 247 (3d Cir. 2021) ("Whether [a] central

2

reason[] is more or less important than another is irrelevant." (cleaned up)). The upshot is this: applicants for asylum need not identify the dominant reason for their persecution, but they still must show that impermissible motivations played more than "an incidental, tangential, or superficial role." *Ndayshimiye*, 557 F.3d at 130.

The IJ faithfully applied that standard here. He stated that Tipan Lopez had to show that "a statutorily protected ground would be one central reason for any future harm against him," A.R. 79, and he repeated that standard throughout his opinion. He found that "neither the respondent's race or ethnicity, nor his religion, were a central reason why the gang was motivated to target him for harm," so he concluded that Tipan Lopez "failed to establish" the requisite nexus. A.R. 80, 83.

The Board followed suit. It explained in more detail that "a respondent cannot establish a protected ground is 'one central reason' for harm when the protected ground is 'at most, incidental or tangential to more commonplace goals, including financial gain and furthering, or preventing interference in, a criminal enterprise.'" A.R. 4 (quoting *In re M-R-M-S-*, 28 I. & N. Dec. 757, 760 (B.I.A. 2023)). The Board agreed with the IJ that Tipan Lopez was targeted for persecution because he interfered with a gang's illicit drug trade, so it concluded that nexus was lacking.

B

The majority reads these decisions differently. It says that the Board ignored our precedent by employing both a

3

"subordination-based" and "animus-based" approach to the nexus requirement. I disagree.

1

Consider first the majority's claim that the Board used a "subordination-based test." Maj. Op. 12. Unable to locate the words "subordinate" or "dominant" in the Board's opinion, the majority instead seizes on the Board's citation to a *different* agency decision. As the majority explains, the Board twice cited its own decision in *M-R-M-S-*, which had defined "central" to exclude motivations that are "incidental, tangential, superficial, *or subordinate to another reason for harm*." 28 I. & N. Dec. at 759 (emphasis added) (citation omitted). Because we rejected part of that standard in *Ndayshimiye*, the majority says the Board committed legal error simply by citing *M-R-M-S-*.

I reject that guilt-by-citation reasoning. To be sure, the standard described in *M-R-M-S-* partially deviates from our precedent—a point which *M-R-M-S-* itself recognized. *See* 28 I. & N. Dec. at 759 n.6 (noting that we "rejected the requirement that a protected ground not be subordinate to another reason for harm"). But the Board did not invoke *M-R-M-S-* to endorse its use of a subordination-based approach to the nexus requirement. In fact, the one time the Board quoted *M-R-M-S-*, it *omitted* subordination language. *See* A.R. 4 ("[A] respondent cannot establish a protected ground is 'one central reason' for harm when the protected ground is 'at most, incidental or tangential to more commonplace goals, including financial gain and furthering, or preventing interference in, a criminal enterprise.'" (quoting *In re M-R-M-S-*, 28 I. & N. Dec. at 760)).

4

Unable to identify an improper quotation in the Board's opinion, the majority pivots to a single citation in a footnote. There, the majority observes, "the BIA's decision explained that *M-R-M-S-* rejected principles from Fourth Circuit cases on which Tipan Lopez relied." Maj. Op. 11 (citing A.R. 4 n.2). Because the Fourth Circuit has "held that a subordination-based test for nexus is impermissible," the majority concludes that the Board endorsed such a test by implication. Maj. Op. 11.

That is a stretch. Tipan Lopez cited *Alvarez Lagos v. Attorney General*, a Fourth Circuit decision, for the proposition that nexus is satisfied when "the protected ground is the reason that an individual, and not someone else, is targeted for persecution." A.R. 18 (citing *Alvarez Lagos v. Att'y Gen.*, 927 F.3d 236, 250 (4th Cir. 2019)). The Board rejected that but-for causal reasoning in *M-R-M-S-*, observing that "[t]he question asked under the Fourth Circuit's approach—why an applicant, and not others, is targeted—is relevant in evaluating the reasons for harm, but it is not the end of the analysis." 28 I. & N. Dec. at 761. That view accords with our own precedent. *See Thayalan*, 997 F.3d at 142–43 ("The characteristic must be *both* a but-for cause of the persecution *and* it must play more than a minor role that is neither incidental nor tangential to another reason for the harm or a means to a non-protected end." (cleaned up)). So when the Board in Tipan Lopez's appeal noted that *M-R-M-S-* "rejected the reasoning the respondent cites from cases in the United States Court of Appeals for the Fourth Circuit," it did not surreptitiously endorse a subordination-based approach to the nexus requirement.[1] A.R.

---

[1] The majority notes that Tipan Lopez also relied on *Alvarez Lagos* for another proposition: that "[t]he protected ground need not be the only reason—or even the dominant or primary

---

5

4 n.2; *cf. United States v. Payo*, 135 F.4th 99, 108 (3d Cir. 2025) ("[S]imply citing a case . . . is not sufficient to raise all arguments that might flow from it." (citation omitted)).

2

Similar tunnel vision leads the majority to find an "animus-based test" in the Board's decision. It is true, as the majority notes, that the IJ in Tipan Lopez's case used the word "animus" three times in its seven-page decision. And I agree that our cases have seldom required asylum seekers to show that their persecutors harbored malicious intent. But those premises do not establish the conclusion that the Board applied the wrong standard to Tipan Lopez's asylum claim.

reason—for the persecution." Maj. Op. 14 (citing *Alvarez Lagos*, 927 F.3d at 250). While accurate, that observation does not help my colleagues' argument. The Board in Tipan Lopez's appeal explained that, at pages 761 to 762 of *M-R-M-S-*, it had "rejected the reasoning the respondent cites from cases in the United States Court of Appeals for the Fourth Circuit." A.R. 4 n.2. At those pages of *M-R-M-S-*, the Board focused specifically on the Fourth Circuit's use of but-for causal reasoning, not its rejection of a subordination-based test for nexus. *See* 28 I. & N. Dec. at 761 ("The question asked under the Fourth Circuit's approach—why an applicant, and not others, is targeted—is relevant in evaluating the reasons for harm, but it is not the end of the analysis."). So the Board in Tipan Lopez's appeal cited *M-R-M-S-* to reject the Fourth Circuit's novel but-for causation approach to the nexus requirement, not to adopt a subordination-based test.

The IJ did not require Tipan Lopez to show "hostility by the persecutor against" his religion. Maj. Op. 15. Several times the IJ correctly identified the applicable legal standard as "one central reason." *See* A.R. 79, 80–83. And he denied relief not because Tipan Lopez failed to show that the Lobos gang members hated Christians but because "the respondent's religion and religious beliefs were not a central reason for why the respondent was attacked or threatened." A.R. 80. So context suggests that the IJ used "animus" as a shorthand for the proper (objective) legal standard, not as a heightened supplement to it.

Our own cases have used "animus" in this way. Title VII, for instance, prohibits sex discrimination regardless of whether the employer's "motivation is desire or hatred," or its acts are "hostile or paternalistic." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999). But we still identify "discriminatory animus" as a key ingredient to employment discrimination claims. *See, e.g.*, *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). And we use the word often in our immigration decisions. *See, e.g.*, *Ghanem*, 14 F.4th at 247 (observing that the Board "failed to account for ample evidence in the record that the animus toward Ghanem extended far beyond his family's manifestations of displeasure with his perceived political opinions").[2]

---

[2] The majority observes that swapping out the phrase "animus toward Ghanem" with the phrase "hatred or hostility toward Ghanem" would "also work." Maj. Op. 18. But it provides no evidence that the *Ghanem* Court actually used "animus" in this

7

The majority insists that "'animus' has a specific meaning" in the immigration context. Maj. Op. 17. But curiously, the executive branch and international law authorities it relies upon do not even *mention* the word "animus," let alone attempt to define it. *See* USCIS: RAIO DIRECTORATE – LESSON PLAN, NEXUS AND THE PROTECTED GROUNDS, at 11 (Jan. 30, 2025); UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status, HCR/1P/4/ENG/REV.4, at 176 (Feb. 2019).

The majority cites two out-of-circuit decisions to bolster its contention that "animus" is a term of art in the immigration context. *See* Maj. Op. 17 (citing *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 668 (6th Cir. 2024) and *Orellana-Recinos v. Garland*, 993 F.3d 851 (10th Cir. 2021)). While *Mazariegos-Rodas* does link "animus" to a hostility requirement, *Orellana-Recinos* is much less clear on the question. There, the Tenth Circuit used the word throughout its opinion, ultimately concluding that nexus was lacking because "the gang members had no animus against [the victim's] family per se." *Orellana-Recinos*, 993 F.3d at 858. Hardly confirming the majority's assertion, *Orellana-Recinos* indicates that federal courts sometimes use the word "animus" in the same way the Board did here.

"[A]nimus" has bedeviled other federal courts, as well. For instance, the First Circuit—one of the few to expressly reject an animus component to the nexus requirement—has acknowledged that it is "not entirely clear what the BIA and

way. In fact, context suggests that the Court used the word in much the same way as the Board did here—as shorthand for the proper standard. *See Ghanem*, 14 F.4th at 247.

8

some of our sister circuits mean by 'animus.'" *Pineda-Maldonado v. Garland*, 91 F.4th 76, 89 n.4 (1st Cir. 2024). When confronted with First Circuit precedents that had used the word, the *Pineda-Maldonado* Court clarified that it did "not read any of" them "to require a showing of . . . hatred or antagonism." *Id.* A survey of our sister courts therefore shows only confusion about the word "animus," not consensus around some immigration-specific meaning.

These observations explain how "animus" is not a term of art in the immigration context and can serve as shorthand for "discriminatory intent" or "discriminatory motivation" rather than "hatred" or "hostility." Because context suggests that the IJ used "animus" in this way, I discern no reversible error in his decision.

C

Even if the Board used the wrong standard in resolving Tipan Lopez's asylum claim, its error was harmless. *See Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011). That's because substantial evidence more than supports the Board's determination that money, not religion, motivated the gang to persecute Tipan Lopez.

The record shows that the Lobos gang repeatedly blamed Tipan Lopez for a decline in their drug profits. Because Tipan Lopez "was preaching the word of God to the young," gang members explained, they "were not selling drugs as before." A.R. 152. They complained that Tipan Lopez was "getting involved with their clients" and even demanded $10,000 as "compensation [for] them not selling the drugs that they were selling before." A.R. 155, 159–60. In fact, when asked if "the whole reason [the gang members] were so angry

9

with you is because you were essentially taking business from them," Tipan Lopez responded "[y]es, that's what they told me." A.R. 180. So the record makes plain that drug profits, not religion, motivated the Lobos gang to target Tipan Lopez.[3]

Tipan Lopez resists that conclusion. He contends that, because faith inspired him to advocate against drug use, any persecution because of that advocacy is necessarily based on religion. But in an asylum case, "[i]t is the persecutors' actual motivation, not the petitioner's beliefs, that are determinative." *Ghanem*, 14 F.4th at 245. So the fact that *Tipan Lopez* was religiously motivated says nothing about what motivated his *persecutors*.

Relying on Fourth Circuit precedent, Tipan Lopez also argues that the gang's financial motives were "'inextricably intertwined' with his religion." Tipan Lopez Br. 38 (quoting *Chicas-Machado v. Garland*, 73 F.4th 261, 266 (4th Cir. 2023)). Because gang members repeatedly tied Tipan Lopez's faith to their declining profits, he insists that it is impossible to separate the two motivations. But this argument runs headlong

---

[3] In an attempt to criticize the Board's decision, the majority notes that "the Lobos castigated Tipan Lopez for 'preaching the word of God,' and brought up his religious views and motivations on more than one occasion." Maj. Op. 18 (cleaned up). But scattered rhetoric is not enough to show nexus, as the majority itself recognizes. *See* Maj. Op. 19 ("The Lobos used a racial slur against indigenous people when they first targeted Tipan Lopez. But he presented no further evidence that the attacks were connected to his race. We therefore deny his petition for review of the link between his persecution and race." (cleaned up)).

into *Ndayshimiye*. There, we explained that "factually intertwined explanations for persecution are irrelevant where the proximate motivation for mistreatment of an applicant is not a protected ground." *Ndayshimiye*, 557 F.3d at 132. So even though the asylum seeker in that case could show that his nationality was bound up with the land dispute that caused his persecution, we held that there was an insufficient nexus because the former motivation was incidental to the latter one. The same is true here—even if the two motivations were intertwined, religion was still incidental to the gang's financial objectives.

\*   \*   \*

Tipan Lopez was persecuted because he interfered with a gang's drug trafficking operation, not on account of any protected ground. Because the majority reaches that result with respect to race and political opinion, I join Part III.B of its opinion. As for Tipan Lopez's religious asylum claim, I would hold that the Board applied the correct legal standard and that, in any event, "[r]emand for reconsideration under the corrected mixed-motives standard is . . . not necessary." *Id.* at 131.

II

The majority also remands Tipan Lopez's CAT claim, concluding that the IJ failed to consider whether Ecuador is "capable of preventing" Tipan Lopez's torture. Maj. Op. 23 (cleaned up). While I agree that Tipan Lopez's CAT claim turns on the meaning of "acquiescence," I disagree that the Board applied the wrong legal standard in answering that question.

The majority faults the Board for "focus[ing] on efforts over outcomes." Maj. Op. 23. My colleagues cite *Gomez-*

11

*Zuluaga v. Attorney General*, 527 F.3d 330 (3d Cir. 2008) and *Pieschacon-Villegas v. Attorney General*, 671 F.3d 303 (3d Cir. 2011) for the proposition that "it matters whether a government can prevent torture, not just whether it is trying." Maj. Op. 23 (citations omitted). But neither case suggests that efforts and outcomes are equally important to the acquiescence inquiry.

Consider *Gomez-Zuluaga*. We held there that "[t]he mere fact that the Colombian government [was] engaged in a protracted civil war with [a paramilitary group] [did] not necessarily mean that it [could not] remain willfully blind to the torturous acts of the [group]." *Gomez-Zuluaga*, 527 F.3d at 351. That was because, despite the government's war efforts, Gomez-Zuluaga produced record evidence that government officials "were aware of the fact that she had been kidnapped and threatened" by the group but indicated that they "would do nothing to stop it." *Id.* at 350–51. We rejected a similar categorical rule in *Pieschacon-Villegas*. The Board there had asserted that "CAT protection does not extend to persons who fear entities that a government is unable to control." *Pieschacon-Villegas*, 671 F.3d at 312 (cleaned up). We disagreed, suggesting instead that a government acquiesces to torture if it believes its law enforcement efforts will not succeed and retreats in the face of violence. *Id.*

Neither decision, however, required the Government to prove the law enforcement capabilities of an alien's home country. To permit a finding of acquiescence when the record shows fervent attempts to resist gang violence would redefine that word.[4] Our cases are instead best read to establish that,

---

[4] Unlike the majority, I do not read *Quinteros v. Attorney General*, 945 F.3d 772 (3d Cir. 2019) to distort "acquiescence" in this way. *Quinteros* must be read in light of *Gomez-Zuluaga*

when a petitioner has record evidence of willful blindness to torture, neither a government's tepid resistance nor its inability to control it will categorically preclude a finding of acquiescence.

The IJ dutifully applied that standard here. His opinion incorporated a memorandum explaining that "[a] government's opposition to or inability to control a group does not bar a showing of acquiescence to torture." A.R. 76 (citations omitted). The IJ then made a predictive finding "that if the respondent reported threats or attacks from the Lobos to the Ecuadorian National Civil Police, the police would act in a way to prevent such harm from occurring to the respondent."[5] A.R. 86. This result, the IJ explained, "would not demonstrate consent, acquiescence, or willful blindness." *Id.* The Board agreed, finding "that the respondent has not demonstrated the requisite consent or acquiescence by a public official." A.R. 4–5. I see no reversible error in this thorough analysis.

The IJ's predictive finding was also supported by substantial evidence. Tipan Lopez never reported his alleged

and *Pieschacon–Villegas*, both of which it cites with approval. *See id.* at 788 n.79. But to the extent that *Quinteros* interpreted "acquiescence" to capture fervent but unsuccessful resistance to torture, it should be revisited.

[5] This is precisely the finding that the majority instructs the agency to explore on remand. *See* Maj. Op. 4 ("We remand Tipan Lopez's CAT claim for the BIA to determine whether Ecuador can protect him from torture, a determination relevant to acquiescence that the BIA did not make."). So it is unclear what more the majority would like the Board to do.

torture to the police. So rather than citing his own experiences, he relied almost entirely on news clippings and country conditions reports, both of which show a government committed to stamping out gang violence. For example, one article reported that Ecuador declared a state of emergency to address rising gang violence in 2022. A year later, another outlet reported that the Ecuadorian "government wants criminal gangs to be classified as terrorists to allow the armed forces to be deployed against the unprecedented tide of drug gang killings." A.R. 430. And when "28 candidates in local elections in cities across" Ecuador were accused "of having possible ties to drug trafficking," the national government opened investigations and referred them for prosecution. A.R. 434. These efforts hardly indicate that Ecuador is "yield[ing] to or accept[ing]" gang-initiated torture. Maj. Op. 21.

For these reasons, the majority's decision to remand Tipan Lopez's claim for relief under the Convention Against Torture is especially untenable.

III

The Board's decision identified and applied the correct legal standards governing Tipan Lopez's asylum and CAT claims. To the extent my colleagues hold otherwise, I respectfully dissent.