**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-3330
_____

JOSE LUIS CRUCES CABRERA; VANESSA YARALDINE HUACPE VIZCARRA;
J. J. C. H.; J. J. C. H.,
Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the Board of Immigration Appeals
(Agency Nos. A241-730-203; A241-730-204; A241-730-205; A241-730-206)
Immigration Judge:  Leila McNeill Mullican
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 12, 2025
_____

Before:  HARDIMAN, KRAUSE, and CHUNG, Circuit Judges

(Filed September 17, 2025)
_____

OPINION[*]
_____

CHUNG, Circuit Judge.

Jose Luis Cruces Cabrera, his wife Vanessa Yaraldine Huacpe Vizcarra, and their

_____

[*]    This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does
not constitute binding precedent.

children (collectively "Petitioners") seek review of a Board of Immigration Appeals ("BIA") order affirming the dismissal of their application for protection under the Convention Against Torture ("CAT"). Petitioners contend that substantial evidence supported their application. We disagree and will deny the petition.

## I.    BACKGROUND[1]

Petitioners are natives and citizens of Peru. Petitioners entered the United States on July 15, 2022, and were later found removable. Petitioners applied for asylum, 8 U.S.C. § 1158, withholding of removal, *id.* § 1231(b)(3), and protection under CAT, 8 C.F.R. §§ 208.16-1208.18 (regulations implementing CAT). They petition only for relief from the BIA's CAT decision.

Petitioners' applications stem from threats they received in Arequipa, Peru, where they owned a guinea pig farm. The farm was located on the property of Cruces Cabrera's mother. In 2022, Petitioners received three notes, written on paper and thrown at the entrance of their home, demanding money from the farm's operations. Although the record does not describe the consequences for non-payment, the notes contained "threatening content." A.R. 165. The threats were anonymous and did not include instructions on how Petitioners were to pay the money. Petitioners never saw the individuals who made the threats and never learned the source of the threats. Around this time, Petitioners also heard gunshots in the vicinity of their home on multiple occasions. The gunshots were fired in the air and did not harm them or their property. Petitioners

---

[1]    Because we write for the parties, we recite only facts pertinent to our decision.

also alleged that Huacpe Vizcarra and a child were almost hit by a van while walking to school one day. They did not recognize either the van or the people in it and no verbal threats or other messages were communicated from the van at the time of the incident.

After these incidents, Cruces Cabrera went to a judge in Peru and received a "guarantee[]" (also referred to as a "denunciation"), which credited his written statement that attempts to extort had been made and acknowledged "that criminal organizations have been carrying out their criminal actions in remote towns, even more than little or nothing has been done to combat such criminal acts." A.R. 165 (citation modified). Cruces Cabrera further testified that, unlike the judge, for the police to "go forward" "[s]omething has to happen for them to do something," and that police could follow up on the guarantee should there be further threats.[2] A.R. 151. Shortly thereafter, Petitioners left Arequipa for Lima, and they remained there between May and July 2022. During their stay in Lima, Petitioners received no additional threats. Petitioners then left for the United States.

Throughout this period, Cruces Cabrera's mother remained in her home and continues to operate the guinea pig farm at reduced capacity. She has not received any

---

[2] There is some dispute about whether Petitioners sought the assistance of law enforcement. Petitioners contend that "they sought assistance from the local authorities including a police officer who was a relative of [] Petitioners." Opening Br. at 4. The brief does not provide a record citation for this assertion. Indeed, record evidence supports the Immigration Judge's ("IJ") conclusion that Petitioners never filed a police complaint, and instead, only consulted a relative who was a police officer. See A.R. at 151. Substantial evidence therefore supports the IJ's finding that Petitioners did not seek the aid of law enforcement.

additional threats since Petitioners fled. Cruces Cabrera's brother took most of the farm stock to another location and no longer operates a farm.

After a hearing, the IJ issued an oral decision denying Petitioners' applications for asylum, withholding of removal, and protection under CAT. As to CAT protection, the IJ concluded that Petitioners had not demonstrated that they would more likely than not be tortured upon their return to Peru. The IJ supported this ruling by finding that the threats were "not menacing or concrete in nature" and that "[t]here was no imminent intention to harm" Petitioners. A.R. 69. The IJ further found support in the fact that Petitioners were never harmed while living at the farm or in Lima, that they were not threatened while living in Lima, and that Cruces Cabrera's mother has not been harmed. Moreover, the IJ concluded that Petitioners had not shown that any torture would be inflicted by, or with the acquiescence of, a public official.

The BIA affirmed.[3] It first held that Petitioners forfeited any challenge to the denial of asylum or statutory withholding of removal. As to their CAT claim, the BIA affirmed on the ground that Petitioners had not shown that the IJ's view of the evidence was clearly erroneous.

Petitioners timely petitioned for review of the BIA's CAT decision.

---

[3] Petitioners argue that "neither a written decision nor a recording of the verbal decision [of the IJ] was provided to Petitioners, who were pro se litigants," before appealing to the BIA. Opening Br. at 13. When they later retained representation, Petitioners contend that counsel still did not timely receive a full copy of the recording. Id. at 13-14. Petitioners failed to raise any related claim to the BIA and any such issue is forfeited. Aguilar v. Att'y Gen. United States, 107 F.4th 164, 168-69 (3d Cir. 2024).

4

## II.   DISCUSSION[4]

To secure CAT protections, a petitioner must show that he or she is "'more likely than not' to be 'tortured if removed to the proposed country of removal.'" Hernandez Garmendia v. Att'y Gen. United States, 28 F.4th 476, 484 (3d Cir. 2022) (quoting 8 C.F.R. § 1208.16(c)(2)). The likelihood determination requires the BIA to assess "what is likely to happen to the petitioner if removed" and whether "what is likely to happen amount[s] to the legal definition of torture." Myrie, 855 F.3d at 516 (internal quotations omitted). To reverse the BIA's likelihood determination, the record must "compel" a contrary conclusion. De Leon-Ochoa v. Att'y Gen. of United States, 622 F.3d 341, 357 (3d Cir. 2010).

We agree with the BIA that Petitioners failed to show that they would more likely than not be tortured upon return to Peru. Three considerations support this conclusion. First, the record does not clearly indicate that the three notes received by Petitioners included any explicit written threat to harm them, but rather that Petitioners perceived the notes as threatening harm to them. Rather, Petitioners perceived the notes as threatening

---

[4]   We have jurisdiction to review the Board's decision under 8 U.S.C. § 1252(a)(1). Argueta-Orellana v. Att'y Gen. United States, 35 F.4th 144, 147 (3d Cir. 2022). We review questions of law de novo, Myrie v. Att'y Gen. United States, 855 F.3d 509, 515 (3d Cir. 2017), and the BIA's findings of fact for substantial evidence, Doe v. Att'y Gen. of the United States, 956 F.3d 135, 140 (3d Cir. 2020). Where the BIA "adopt[s] the IJ's reasons concerning the denial of CAT relief, we review both the BIA and IJ decisions." Grijalva Martinez v. Att'y Gen. of United States, 978 F.3d 860, 871 n.11 (3d Cir. 2020) (internal quotations omitted). We review the issue of whether the petitioner will likely be tortured on removal for substantial evidence. See Lopez v. Att'y Gen. United States of America, 142 F.4th 162, 170 (3d Cir. 2025).

harm to them. Moreover, Petitioners' descriptions of the threat to their safety were vague and nebulous. Petitioners did not see who delivered the anonymous threats, made a presumption as to the general identity of the threats' source(s), and the threats did not explain how Petitioners were to pay the money. See Hernandez Garmendia, 28 F.4th at 484 (denying CAT protections where, in part, petitioner "did not know who would torture him" and that petitioner "made only generalized statements insufficient to show that harm would more likely than not result if returned to El Salvador"); see also Denis v. Att'y Gen. of United States, 633 F.3d 201, 218 (3d Cir. 2011) ("unsupported speculation" and "chain[s] of assumptions … of what might happen" upon return are insufficient to satisfy the CAT likelihood standard (internal quotations omitted)). Additionally, the threats ceased after Petitioners moved to Lima. See 8 C.F.R. § 1208.16(c)(3)(ii) (providing that adjudicator should consider "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured").

Second, neither Petitioners nor Cruces Cabrera's mother were physically harmed while living at their farm. Although a van almost hit Huacpe Vizcarra and her child, Petitioners did not sufficiently connect this incident to the threats or show that the incident "was a targeted attack instead of an accident." A.R. 71. Nor were Petitioners harmed during their stay in Lima.

Third, Petitioners' family has not been harmed or threatened since Petitioners left Peru. Indeed, Cruces Cabrera's mother—who continues to operate the guinea pig farm— has received no additional threats since Petitioners' departure, and Cruces Cabrera's brother no longer operates the other portion of the farm.

6

In short, the record before us does not support reversing the BIA's conclusion, much less "compel[]" it. Hernandez Garmendia, 28 F.4th at 484.

Petitioners separately contend that the IJ erred by "ignor[ing] the [Peruvian] country conditions and travel warnings issued by the Department of State." Opening Br. at 13. Had the IJ considered those materials, Petitioners argue that the IJ would have concluded that they established they would face torture with the acquiescence of the government. Petitioners note that "the Travel Warnings and the Country Conditions issued by the Department of State clearly describe conditions which caused tagging the country as level 2, as Exercise Increased Caution … and level 4, as Do Not Travel, for certain areas of the country which are close to the area where the Petitioners' guinea pig farm and home was." Id. at 15. But Petitioners did not ask the IJ to take administrative notice of any reports or travel warnings concerning Peru and therefore forfeited this issue. Even if they had, "[t]he specter of torture must be supported by specific evidence that the *individual applicant* is more likely than not to be singled out." Hernandez Garmendia, 28 F.4th at 484 (emphasis added). Although official travel warnings and reports on country conditions can lend support to an alien's application, Kang v. Att'y Gen. of United States, 611 F.3d 157, 164-66 (3d Cir. 2010), they are insufficient, standing alone, to confer CAT protection and Petitioners have not demonstrated how the threats they received fall within the scope of the activities noted in the Conditions Report. Finally, given that Petitioners have not established that they are likely to be tortured if removed to Peru, were the IJ to have considered the Country Conditions' statements regarding inadequate governmental responses, such consideration would have no effect on the IJ's denial of their application

7

for CAT protection.

### III.    CONCLUSION

For the reasons set forth above, we will deny the petition for review.